## Holmes' Appeal.

600

Argued October 5, 1954. Before STERN, C. J., STEARNE, JONES, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*William J. Woolston*, for appellant.

*Samuel Dash*, Assistant District Attorney, with him *Michael von Moschzisker*, First Assistant District Attorney and *Richardson Dilworth*, District Attorney, for appellee.

*Frank P. Lawley, Jr.*, Deputy Attorney General, with him *Harry F. Stambaugh*, Special Counsel and *Frank F. Truscott*, Attorney General, for Commonwealth, under Rule 46.

*John Rogers Carroll* and *Thomas A. Masterson* filed a brief for American Civil Liberties Union, amicus curiae.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, November 23, 1954:

We allowed an appeal in this case from the order of the Superior Court (175 Pa. Superior Ct. 137, 103 A. 2d 454) because appellant's petition asserted that questions of his constitutional rights were involved.

Appellant, Joseph Holmes, had been in trouble with the authorities several times before the proceedings which gave rise to the present appeal. In 1949, when he was 13 years of age, he was adjudged delinquent by the Juvenile Division of the Municipal Court of Philadelphia on a petition alleging that he was involved in a highway robbery, and he was then placed on probation. He was later accused of participation in a burglary, but that offense was not proved; however, he failed to attend school for long periods of time and in 1951 his probation was continued. He continued to be a persistent truant from school, and, in August, 1952, being charged with participation in a highway robbery and assault and battery, he was committed to Pennypack House and remained there until November of that year when he was again placed on probation.

This brings us to the hearing before the Juvenile Court on January 7, 1953, the delinquency petition alleging larceny of an automobile, operating an automobile without the owner's consent, and operating an automobile without a driver's license. There was definite evidence that the automobile had been stolen and appellant admitted driving it without a license but he denied guilty knowledge of the theft of the car. The Juvenile Court adjudged him delinquent on the charge of operating a motor vehicle without a license. Five days later a delinquency petition was filed alleging his participation in the armed robbery of a church. At a hearing on that charge held on January 23, 1953, the court revoked his probation and committed him to the Pennsylvania Industrial School at White Hill, basing

this action on his prior record, his present activities, the failure of his parents to control him, and the desirability of his receiving the training provided in such an institution. Counsel for appellant thereupon intervened and requested a rehearing, which was held on March 6, 1953, and at which additional testimony was taken.[1] The court repeated its adjudication of delinquency and ordered Holmes remanded to White Hill. On appeal to the Superior Court this order was affirmed.

Appellant's able counsel has urged upon us, as upon the Superior Court, many claims of illegality and deprivation of constitutional rights in connection with the proceedings before the Municipal Court. Such claims, however, entirely overlook, in our opinion, the basic concept of a Juvenile Court. The proceedings in such a court are not in the nature of a criminal trial but constitute merely a civil inquiry or action looking to the treatment, reformation and rehabilitation of the minor child. Their purpose is not penal but protective,—aimed to check juvenile delinquency and to throw around a child, just starting, perhaps, on an evil course and deprived of proper parental care, the strong arm of the State acting as parens patriae. The State is not seeking to punish an offender but to salvage a boy who may be in danger of becoming one, and to safeguard his adolescent life. Even though the child's delinquency may result from the commission of a criminal act the State extends to such a child the same care and training as to one merely neglected, destitute or physically handi-

---

[1] Section 15 of The Juvenile Court Law evidently presupposed that additional testimony may be received at a rehearing because it provides that such testimony shall be taken down and transcribed by an official stenographer and made a part of the record in the case.

capped. No suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court.

The conception that children are regarded as wards of the State is not one of recent origin; indeed from the very earliest times children in England were regarded as the wards of Chancery, and the Chancellor exercised the prerogatives of the Crown in acting for the care, treatment and protection of unfortunate minors and placing them under proper guardianship.[2] The first Juvenile Court was established in 1899. In our own Commonwealth The Juvenile Court Law of June 2, 1933, P. L. 1433, section 8, gave to the judges of the Municipal Court in Philadelphia the duty, after an inquiry of the facts at a hearing, to determine whether the best interests and welfare of a child and the State required the care, guidance and control of such child, and to make an order accordingly; by the amendatory Act of June 15, 1939, P. L. 394, the word "child," as used in the Act, is defined to mean a minor under the age of 18 years.

One of the principal contentions made by appellant is that he was improperly compelled to answer a question the answer to which involved self-incrimination, namely, whether he had a license to drive an automobile, to which he answered "No." Article I, Section 9, of the Constitution provides that "In all *crim-*

---

[2] There will be recalled the famous proceeding in which Lord Chancellor Eldon in 1817 deprived Shelley of the custody of his two children on the ground that he had deserted his wife, Harriet, (who had shortly before committed suicide) and thereafter unlawfully cohabited with Mary Godwin (whom he subsequently married) ; also on the ground that he apparently intended to inculcate in his offspring his own atheistic and anti-social opinions. The chancellor appointed a curator to take charge of the children. The proceedings are reported in Jacob's Chancery Reports, p. 266, sub. nom. *Shelley v. Westbrooke,* the Westbrooke being Harriet's father.

*inal* prosecutions the accused . . . cannot be compelled to give evidence against himself." But since, as pointed out, Juvenile Courts *are not criminal courts,* the constitutional rights granted to persons accused of *crime* are not applicable to children brought before them, as was definitely held in the elaborate opinion of Mr. Justice BROWN in *Commonwealth v. Fisher,* 213 Pa. 48, 62 A. 198, which held the Act of April 23, 1903, P. L. 274, the forerunner of the present Juvenile Court Act, constitutional. It may be added that appellant was not "compelled" to testify; he was questioned in the same manner and in the same spirit as a parent might have acted, for whom, under the theory of juvenile court legislation, the State was substituting. It is true that section 18 of The Juvenile Court Law provides that if the child had been held by a magistrate or justice of the peace for any offense, other than murder, punishable by imprisonment in a State penitentiary, the judge of the Juvenile Court might, if in his opinion the interests of the State required a prosecution of such case on an indictment, certify the same to the district attorney of the county, who should thereupon proceed with the case in the same manner as though the jurisdiction of the Juvenile Court had never attached. But such a certification could not be made after the Juvenile Court had made an adjudication of delinquency nor, perhaps, after any self-incriminatory examination of the child. That question is not here involved, but it may be noted that section 19 of the Act provides that "The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court.".

Appellant complains that the court received certain hearsay testimony in regard to the charge that he was implicated in the armed robbery of the church. It

seems that one of the two men who were convicted of that crime had confessed to having committed it, and a detective testified at appellant's hearing as to the substance of that confession and that it implicated appellant. It is true that subsequently the man who had made the confession repudiated it and now stated that appellant did not participate in the robbery, but of course the judge was not obliged to believe his retraction. He admitted that he had made the confession and the fact that the testimony of the detective was technically "hearsay" was therefore wholly unimportant. Moreover, from the very nature of the hearings in the Juvenile Court it cannot be required that strict rules of evidence should be applied as they properly would be in the trial of cases in the criminal court. Although, of course, a finding of delinquency must be based on sufficient competent evidence, the hearing in the Juvenile Court may, in order to accomplish the purposes for which juvenile court legislation is designed, avoid many of the legalistic features of the rules of evidence customarily applicable to other judicial hearings. Even from a purely technical standpoint hearsay evidence, if it is admitted without objection and is relevant and material to the issue, is to be given its natural probative effect and may be received as direct evidence: *Harrah v. Montour R. R. Co.,* 321 Pa. 526, 184 A. 666; *Sledzianowski Unemployment Compensation Case,* 168 Pa. Superior Ct. 37, 76 A. 2d 666. Moreover, there is nothing in the record to indicate that the judge who presided in the Juvenile Court acted in the final disposition of appellant's case on the basis of any conclusion that appellant had in fact participated in the armed robbery of the church.

Counsel for appellant demanded of the court the right to inspect the records of the proceedings in connection with appellant's case; claiming to be entitled

thereto by virtue of the provision of section 3 of The Juvenile Court Law which provides that such records should be kept in a docket and should be open to inspection by the parent or other representative of the person concerned. The court granted this request as far as the notes of testimony were concerned but refused it as to the reports of probation officers. As the Superior Court properly held, the records referred to in the statute are obviously the ordinary petitions, docket entries, notes of testimony and court orders; the reports received by the court from probation officers are not entered in the docket as a part of the "records of the proceedings." It is true that ex parte information received by the court and not publicly disclosed cannot properly be made the basis of a finding of delinquency in the Juvenile Court any more than of any important adverse finding in a trial before a judge in any other court.[3] However, this rule does not apply in connection with the determination of a *sentence* in a criminal court and, all the more, should not apply to the disposition of a case in a Juvenile Court. In *Williams v. New York,* 337 U. S. 241, the court pointed out that, as distinguished from the situation where the question for consideration is the *guilt* of a defendant, it has always been the right of a court in sentencing to consider information concerning the defendant's past life, health, habits, conduct, and mental

---

[3] As to ordinary criminal and civil courts: *Commonwealth v. Johnson,* 348 Pa. 349, 35 A. 2d 312; *Commonwealth ex rel. Ritter v. Ritter,* 91 Pa. Superior Ct. 563; *Commonwealth ex rel. Mark v. Mark,* 115 Pa. Superior Ct. 181, 175 A. 289; *Commonwealth ex rel. McClenen v. McClenen,* 127 Pa. Superior Ct. 471, 193 A. 83; *Commonwealth ex rel. Knode v. Knode,* 145 Pa. Superior Ct. 1, 20 A. 2d 896; *Commonwealth ex rel. Oncay v. Oncay,* 153 Pa. Superior Ct. 569, 34 A. 2d 839; *Commonwealth ex rel. Balick v. Balick,* 172 Pa. Superior Ct. 196, 92 A. 2d 703.

608

and moral propensities, even though such information is obtained outside the courtroom from persons whom the defendant has not been permitted to confront or cross-examine. The court said: (p. 247) "Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." And further (p. 249): "Under the practice of individualizing punishments, investigational techniques have been given an important role. Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders. Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information." If all this is true as applicable to a criminal court it is certainly a fortiori true in regard to proceedings in the Juvenile Court.

Counsel for appellant makes much of the contention that the hearings of January 23 and March 6, 1953, could not properly have been for the purpose of determining whether appellant's probation should be revoked because section 12 of The Juvenile Court Law provides that any amendment of an order made by it should be upon motion of the district attorney or a probation officer or upon petition of any other person in interest after notice both to the district attorney and a probation officer, and it is claimed that here there was no such motion made or petition presented. It is, however, wholly immaterial whether those hearings were initiated for the purpose of passing upon the

revocation of appellant's probation or considering an adjudication of delinquency. Neither the district attorney nor any probation officer complains of any lack of notice. At the January hearing the court had revoked appellant's probation, and while, at the rehearing, it again adjudged appellant delinquent, the order remanding him to White Hill was in effect merely a reaffirmation of the revocation of the probation.

Complaint is made of the fact that it does not affirmatively appear from the record that notices of the hearings were given to appellant's parents. The parents of a child involved in a Juvenile Court proceeding should certainly be notified in regard to what ought to be to them a matter of supreme importance. It has been held to be "an abuse of discretion for a [juvenile] court to go into such hearing and adjudication without notice to the persons having custody of the child, and without an opportunity for them to be heard, unless imperious reasons exist therefor.": *Rose Child Dependency Case,* 161 Pa. Superior Ct. 204, 207, 208, 54 A. 2d 297, 298. However, the record definitely indicates a total lack of interest on the part of appellant's parents rather than any absence of notification to them on the part of the court. After counsel appeared in the case it must be assumed that he was in touch with them and that, if they had wanted to be present they would have been there instead of the uncle and aunt who did appear. Appellant's repeated derelictions are proof positive of the fact either that his parents were indifferent to his bad behavior or were unable to control him.

A final complaint is urged in regard to the court's commitment of appellant to White Hill on the alleged ground that the inmates of that institution are not restricted to delinquent juveniles but may include also persons convicted of crime in a criminal court, and

that the purpose of The Juvenile Court Law is to guard children from association and contact with crime and criminals. Section 8 of The Juvenile Court Law, as amended by the Act of June 15, 1939, P. L. 394, provides that the court may "Commit any child over the age of sixteen years to any state industrial school or home for the reformation and correction of youths above the age of sixteen." The fact that the Act of July 29, 1953, P. L. 1447, provides that minors between the ages of fifteen and twenty-one who were sentenced in the criminal court may be committed to the Pennsylvania Industrial School if not known to have been previously sentenced to a State penitentiary does not make that institution a prison; the Act merely extends the benefits of reformatory treatment to minors even though convicted in the criminal court instead of being adjudged delinquent in the Juvenile Court. Commitments by the Juvenile Court to such institution are therefore proper and have been supported by the courts without question.[4]

The order of the Superior Court is affirmed.

----

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In upholding the commitment of Joseph Holmes, a minor, to the Pennsylvania Industrial School at White Hill, a reformatory, the Majority uses the argument employed down through the centuries by Spartan parents, namely, that disciplinary treatment is administered to a child only for his own good. But this approach to the problem before us completely misses the

----

[4] *Trignani's Case*, 150 Pa. Superior Ct. 491, 28 A. 2d 702; *Weintraub Appeal*, 166 Pa. Superior Ct. 342, 71 A. 2d 823; *Commonwealth ex rel. Perino v. Burke*, 175 Pa. Superior Ct. 291, 104 A. 2d 163; *Commonwealth ex rel. O'Donnell v. Prasse*, 84 D. & C. 306.

target of inquiry. The question is not *how* Joseph Holmes should be treated, but whether he should be "treated" at all.

There are two phases to every Juvenile Court proceeding: (1) Determination as to whether the juvenile involved is delinquent or not; (2) Decision as to whether the juvenile is to be returned to his home, placed in a foster home, or committed to a reform institution. It is the first phase with which we are most concerned in this appeal.

How is the presence or absence of guilt to be ascertained? In all civilized countries it is determined by following a certain organized procedure which assures to the accused an opportunity to assert his innocence, face his accusers, call witnesses in his behalf, obtain the services of counsel and be adjudged by an impartial tribunal. Nowhere in the world are the rights of an accused so jealously guarded as in the United States. The case before us, however, presents an amazing paradox in jurisprudence. This Court says, through a majority of the Justices, that certain constitutional and legal guarantees such as immunity against self-incrimination, prohibition of hearsay, interdiction of ex parte and secret reports, all so zealously upheld in decisions from Alabama to Wyoming, are to be jettisoned in Pennsylvania when the person at the bar of justice is a tender-aged boy or girl.

The Majority is of the impression that the adjudication of delinquency of a minor is not a very serious matter because "No suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court." This statement stamps the judicial imprimatur on the declaration in Section 19 of The Juvenile Court Law that: "No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal laws of the Common-

wealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime." These words are put together so as to form beautiful language but unfortunately the charitable thought expressed therein does not square with the realities of life. To say that a graduate of a reform school is not to be "deemed a criminal" is very praiseworthy but this placid bromide commands no authority in the fiercely competitive fields of every-day modern life.

A most disturbing fallacy abides in the notion that a Juvenile Court record does its owner no harm. The grim truth is that a Juvenile Court record is a lengthening chain that its riveted possessor will drag after him through childhood, youthhood, adulthood and middle age. Even when the ill-starred child becomes an old man the record will be there to haunt, plague and torment him. It will be an ominous shadow following his tottering steps, it will stand by his bed at night and it will hover over him when he dozes fitfully in the dusk of his remaining day.

It is equally a delusion to say that a Juvenile Court record does not handicap because it cannot be used against the minor in any court. In point of fact it will be a witness against him in the court of business and commerce, it will be a bar sinister to him in the court of society where the penalties inflicted for deviation from conventional codes can be as ruinous as those imposed in any criminal court, it will be a sword of Damocles hanging over his head in public life, it will be a weapon to hold him at bay as he seeks respectable and honorable employment. It is easy to say that the record will not be used in court but it already has been introduced in this case against Joseph Holmes in the imperishable dockets of several courts, it has been printed in the briefs which the world can

read, and it will be published in the decisions of the Superior and Supreme Courts.

It would not be kind to name the many figures in the world of sports, politics, entertainment and letters who have been embarrassed, harassed and encumbered because of a Juvenile Court record. And when I see how the intended guardian angel of the Juvenile Court sometimes nods at the time that the most important question of all—innocence or guilt—is being considered, I wonder whether some of these public figures may not have been unjustly tainted in their childhood.

Reading and studying the whole record in this case, it seems to me that a very erroneous idea pervades the reasoning of the judges throughout, namely, that a Juvenile Court hearing is simply an administrative procedure because its purpose eventually is to provide education, care and supervision over the subject of its jurisdiction. But when the minor is charged with what (as against an adult), would be a felony, and the minor denies the charge, the resulting proceeding can only be a judicial *contest* to determine conflicting facts and contentions; and, being such, it is a *trial* in every sense of the word. It was well said in *Hedden v. Hand,* 90 N. J. Eq. 583, that "It is idle to entertain the thought for a single moment that the legislature can change the nature of an offense by changing the forum in which it is tried."

The Majority of this Court, as well as the courts below, have spoken almost feelingly of the great care that the State bestows on a juvenile after he has been adjudged a delinquent, pointing out that the State thenceforth regards him not as a criminal but as a ward. But fairness and justice certainly recognize that a child has the right *not* to be a ward of the State, *not* to be committed to a reformatory, *not* to be deprived of his liberty, if he is innocent. The procedure for as-

certaining the guilt or innocence of a minor may be designated a hearing or a civil inquiry, as the Majority says, but in substance and form it is a trial—a momentous trial which means even more than one which confronts an adult, because in the Juvenile Court trial the defendant's whole mature life still lies before him. And no matter how trained and experienced a Juvenile Court judge may be, he cannot by any magical fishing rod draw forth the truth out of a confused sea of speculation, rumor, suspicion and hearsay. He must follow certain procedures which the wisdom of centuries has established.

Although I do not agree with the conclusions reached by the Superior Court in this case, it certainly has pronounced the law accurately in declaring that the proceeding in a Juvenile Court hearing "is an action in a court of record, the court must have jurisdiction, its basic findings *must be supported by evidence and the rudiments of procedural due process and fair play must be observed. The record must be legally and factually adequate to sustain the findings of fact and order of commitment. . . .* The action of the juvenile court is always subject to appellate review and *correction for errors of law or abuse of discretion.*" (175 Pa. Superior Ct. 137.)\* (Italics throughout mine, unless otherwise indicated.)

The distinguished Court of Appeals of New York State stressed as far back as November, 1932, that proceedings in Juvenile Courts (called Children's Court in New York) cannot ignore constitutional safeguards: "There must be a reasonably definite charge. *The customary rules of evidence shown by long experience as essential in getting at the truth with reasonable certainty in civil trials must be adhered to.* The finding

---

\* Footnote.

of fact must rest on the preponderance of evidence adduced under those rules. *Hearsay, opinion, gossip, bias, prejudice, trends of hostile neighborhood feeling, the hopes and fears of social workers, are all sources of error and have no more place in Children's Courts than in any other court.*" (*People v. Lewis,* 260 N. Y. 171, 178.)

The same Court said in the case of *People v. Fitzgerald,* 244 N. Y. 307: "Our activities in behalf of the child may have been awakened, but the fundamental ideas of criminal procedure have not changed. These require a definite charge, a hearing, competent proof and a judgment. *Anything less is arbitrary power.*"

The concept that in Juvenile Court the State acts as *parens patriae* is being somewhat overdone. Even if the State assumes the parental role, this assumption does not prove that, by divine omniscience, it cannot be other than just. It is not impossible for a father, or even a mother, to be unreasonable with offspring. What a child charged with crime is entitled to, is *justice* not a *parens patriae* which in time may become a little calloused, partially cynical and somewhat over-condescending. The child may not want to be treated parens patriaely, parens patriarchally, or parens patronizingly!

The argument is advanced throughout these entire proceedings that the State entertains no desire to punish a juvenile and, for that reason, some relaxation in strict court procedure is justified and even commendable. But informality may be at times carried to the point of confusion, sloppiness and unreliability. The appellee Commonwealth categorically declares in its brief that "commitment to an industrial school is not punishment." But it certainly does not come under the classification of pleasure. Calling a reformatory

an "industrial school" does not mitigate its bleakness, loneliness and destitution of parental love and care.

What is punishment? It is the infliction of pain, sorrow, and grief. To take a child from the comfort of his home, the joy of his companions and the freedom of field, river and wood, and confine him to a building with whitewashed walls, regimented routine and institutional hours is punishment in the strictest sense of the word. To say, as the Commonwealth says, that this institutionalized incarceration is "for the care and treatment" of the juvenile does not make it any less abhorrent to the boy of spirit, health and energy.

The Commonwealth argues further in its brief that many constitutional restrictions against prosecuting authorities in a trial of adults in the criminal courts do not apply in Juvenile Court because the proceedings there do not constitute a criminal trial. From this it is argued that in Juvenile Court proceedings the rules of evidence may be relaxed. To say that the rules of evidence may be relaxed in Juvenile Court is like saying that during a surgical operation on a child the surgeon may relax the rules of precise hygiene. Hygienic precautions in the operating room are taken to keep out microbes and germs of infection in the same way that rules of evidence in court erect barriers to bar the microbes of lies, the germs of prejudice and the infection of rumor.

The proceedings before us for review involve three different hearings: January 6, January 23 and March 6, 1953. The Majority points out in its Opinion that at the first hearing, Joseph Holmes was charged with stealing an automobile, operating an automobile without the owner's consent and operating a car without a driver's license. The Majority concedes that there was no evidence which connected Holmes with larceny

of an automobile. Joseph denied all knowledge of the theft but he was adjudged a delinquent on the charge of operating a motor vehicle without a license.

On January 23, 1953, Joseph Holmes came before the Court on the very serious charge of participation in the robbery of a church. The so-called evidence presented to establish his participation in this robbery is so devoid of every symptom of competence that were a District Attorney to attempt to produce this same kind of testimony against an adult defendant in Criminal Court, he would properly earn for himself the censure of the Court. At this Juvenile Court hearing on January 23rd a detective by the name of Ashmore was allowed to testify orally to an alleged confession by a third person who, he reported, charged Holmes with participation in the robbery. The detective did not exhibit the confession, he did not produce the confessor, and the defendant Holmes was not given an opportunity to face the stranger who had supposedly implicated him. The Majority, which would undoubtedly condemn such sham testimony if presented in a Criminal Court, accepts it implicitly here because it is introduced against a child in Juvenile Court. The Majority goes further. It even pays a tribute to hearsay testimony and says that, unless objected to, it may be received as direct evidence. The statement that hearsay may be utilized to strike down a child charged with the most reprehensible of crimes—robbery of a church—is to me appalling.

Hearsay is merely a legal term for unconfirmed rumor. Pouring rumored scandal into the bent ear of blabbering busybodies in a pool room or gambling house is no more disreputable than pronouncing it with clipped accent in a courtroom. Hearsay is not dross in one proceeding and gold in another. It is a deceptive commodity which should not be accepted in any

market of freedom except under the most unusual circumstances which certainly are not present here.

If someone actually made a confession implicating Joseph Holmes in the alleged robbery of a church, why was that person not brought into court? The sheer legal nullity of the hearing of January 23rd, insofar as it attached culpability to Joseph Holmes, could not be better shown than by the fact that the to-be-accused Holmes was not even informed beforehand that he was to be charged with armed robbery. This startling omission offends against the elemental standards of the most primitive trials.

The record of the entire hearing of January 23rd is scarcely recognizable as a responsible proceeding in an American court and especially a tribunal involving the liberty of a young citizen. Detective Ashmore testified: "In regard to these two boys here, Holmes and Richard Hodges, one of the boys that was arrested here had given a signed confession and they implicated these two boys." Ashmore then proceeded, as indicated above, to give an oral description of the statement supposedly signed by one Widman. The Court, instead of demanding the exhibition of the confession or, more imperatively, the appearance of Widman himself, listened to this fantastic hearsay and then asked: "What did Hodges and Holmes actually do in the holdup?" This question was not only improper but it revealed a most serious lack of appreciation on the part of the Court as to its judicial duties. Ashmore had no knowledge of his own as to what Hodges and Holmes had done, he did not know whether Hodges and Holmes had participated in the holdup, and was in fact personally ignorant of facts as to whether there even was a holdup. The Court, brushing all this incompetence aside, and accepting Ashmore's ignorance as knowledge, his non-presence as presence and his ir-

responsibility as reliability, questioned this bearer of twice-told tales as follows: *"What did Hodges and Holmes do in the holdup?"*

And then, the only questions put to Joseph Holmes on the grave accusation against him of armed robbery were the following: "BY THE COURT (to Joseph Holmes) Q. What about it, Joseph? A. He came to my house and picked me up. I had nothing to do with it. Q. You were in on the robbery? A. No, I haven't been identified by anybody. Skeets said he's going to tell you I had nothing to do with it."

Ashmore was now permitted to testify to more heterogeneous hearsay and then the Court summed up: "I heard enough." On this "evidence," the Court stripped Joseph Holmes of his liberty, deprived him of his home and parental care, and committed him to the melancholy shadows of a corrective, juvenile reformatory.

In justification of this incredible procedure, the Majority, as heretofore stated, says that it is proper to receive hearsay when it is admitted without objection. What did Joseph Holmes know about objections? He is a minor. He had no lawyer to represent him. No one informed him as to his rights. He was not told he could object. A child in a courtroom amid a throng of police officers, probation officers, court attendants and other officials, with a judge officiating from a podium, is not apt to summon the audacity, even if he possessed the knowledge, to lift his voice and cry out that what a police officer testified to was hearsay, even if he knew what hearsay meant. Children are usually brought up with the admonition that "they are not to speak unless spoken to." To convict a child of crime because he does not object to what a judge should never have allowed to be heard in the first place is, in my opinion, an unfairness that sheds none of its repellence because approved by an appellate court.

But there is something more extraordinary about this affair than I have already indicated. At the third hearing (the one on March 6, 1953) the heretofore-missing Widman came into Court and repudiated the confession in which it was alleged he had implicated Joseph Holmes. But on this important disclosure the Majority makes the amazing observation: "Of course the judge was not obliged to believe his (Widman's) retraction." It cannot be denied that the Judge was not compelled to believe Widman. He was not obliged to believe anything that might be presented in exoneration of charges against Holmes. That is the prerogative of a Judge, and he needs to answer only to his conscience. But if a Judge chooses to close his ears to the words of the actual robber, it is difficult to understand why he should accept as gospel the erratic narrative of a third-handed listener of a distantly-told tale. But if, as the Majority suggests, the Juvenile Court Judge could disbelieve Widman's retraction, he then could only go back to the credibility-riddled narrative of Ashmore whose knowledge of the holdup was zero.

The Majority says that "there is nothing in the record to indicate that the judge who presided in the Juvenile Court acted in the final disposition of appellant's case on the basis of any conclusion that appellant had in fact participated in the armed robbery of the church." The record reports the following: "BY THE COURT (To Joseph Holmes): Q. Joseph, you have been before us too many times for me just to disregard this. Highway robbery in 1949, burglary in 1951, highway robbery in 1952, discharged from Pennypack House two months later, and *now this*. A. I had nothing to do with it. THE COURT: I am sending you to White Hill."

What did the Judge mean by "and now *this*?" He could only mean the robbery of the church because that

was the *only* offense then under discussion. Moreover, his reference to highway robberies in 1949 and 1952 and a burglary in 1951 was not only gratuitous but unjustified. If the proof of participation in the past robberies and burglary was no stronger than that presented in connection with the church robbery one could well fear that Holmes has received little of the protection for minors for which Juvenile Courts were created. In point of fact, Joseph Holmes was never proved guilty of the crimes referred to. The Majority makes that admission at the very beginning of its Opinion, when it says: "In 1949, when he was 13 years of age, he was adjudged delinquent by the Juvenile Division of the Municipal Court of Philadelphia on a petition *alleging* that he was involved in a highway robbery . . . He was later *accused* of participation in a burglary, but that offense *was not proved* . . . and, in August, 1952, being *charged* with participation in a highway robbery and assault and battery, he was committed to Pennypack House."

One could almost be embarrassed in stating the question to be decided in this case. Candidly put, it is nothing less than: "Are children entitled to the protection of the Constitution of the United States and the Constitution of Pennsylvania?" It is almost like asking: Should children be fed, clothed and sheltered? And yet, this question (that is, the first one) has been answered in the negative by the Majority of this Court. We have apparently reached such a state of inevitable disputation in the law that one wonders if anything can ever be pronounced with juridical finality. We may yet hear a challenging of the law of gravitation, the law of cause and effect, and the law governing the planets as they swing through infinity in their appointed orbits in the universe.

Article 1, Section 9 of the Constitution of Pennsylvania states categorically: "In all criminal prosecu-

tions the accused hath a right to be heard by himself and his counsel, to *demand the nature and cause of the accusation against him, to meet the witnesses face to face,* to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; *he cannot be compelled to give evidence against himself, nor can he be deprived of his* life, *liberty* or property, *unless by* the judgment of his peers or *the law of the land."* On January 23, 1953, Joseph Holmes' constitutional rights were invaded in that he was brought to trial without being informed of "the nature and cause of the accusation against him," he was not allowed to meet his accusing "witnesses face to face," and he was deprived of his liberty beyond "the law of the land." The constitutional provision quoted does not restrict the enumerated ironclad guarantees therein to accused *adults.* It says *accused* without limitation of any kind. By what authority, then, do we exclude children from this vast reservation of protection?

If we were to accept the utterly illogical proposition that a child is better guarded by denying him the security of the above-mentioned constitutional guarantees, why shouldn't we then throw the same defensive armor around women who are invariably regarded as being less able to fend for themselves than men? And if the extravagant supposition is accepted that children and women are in a superior position of vantage *outside* the Constitution, why not turn out of the State's tabernacle of inalienable rights the crippled, the mutilated, the aged and the blind? Certainly they are entitled to the same privleges which go to helpless children and women.

The Juvenile Court jurisdiction was originally limited to children up to the age of 16 years; it has now

been extended to minors under 18 years of age. The interesting development then presents itself that if, instead of being tried on January 23, 1953, Holmes had been brought into court on May 7, 1954 (his 18th birthday), he would have been entitled to a jury trial. At a jury trial the Commonwealth could not possibly have sustained a conviction with the shamefully inadequate and incompetent so-called evidence presented in Juvenile Court on January 23rd. And with this irrefutable proposition before us, how can we accept the adjudication of delinquency in Juvenile Court when the evidence supporting it would have acquitted Holmes in Criminal Court? Is the good name of a citizen, to say nothing of his liberty, to depend on whether he is brought to trial sixteen months sooner or later?

The Majority contends that since "Juvenile Courts are not Criminal Courts the Constitutional rights granted to persons accused of *crime** are not applicable to children brought before them."

What the Majority says here is that the protection assured the most penitentiary-hardened adult criminal cannot be offered to children. Aside from the inhumanity embodied in such an observation it is subject to criticism for other reasons. In the first place, it is not true, for instance, that the constitutional immunity against self-incrimination is limited to criminal court trials. This immunity applies anywhere and everywhere; it applies to any proceeding which can conceivably end in a criminal prosecution. Practically every day the Fifth Amendment of the United States Constitution (in this respect the counterpart of Art. I, Sec. 9 of the Pennsylvania Constitution) is invoked

---

* The Majority italicizes *crime* in its Opinion. Is armed robbery not a crime? Is it less a crime because allegedly committed by a minor?)

before legislative committees which are certainly not branches of a criminal court. The immunity against self-incrimination may be invoked in the civil law courts and equity courts if one is asked a question the answer to which may become a link leading to involvement in criminal prosecution. The immunity can be used as a barrier against being questioned in a magistrate's court or before a justice of the peace. It can be employed anywhere except, according to the Majority, where it should, in all fairness, receive the highest sanction—in Juvenile Court. This Constitutional immunity is obviously intended to help those unjustly accused of wrongdoing. If then, it is handed to adults as a shield, why should it become a sword when the person accused is a child?

The Juvenile Court Law provides that if a minor is held for any offense (except murder) punishable by imprisonment in a state penitentiary, the judge of the Juvenile Court may certify the case to the district attorney. Although the Majority asserts that the minor is entitled to protection, it still will not make the bold statement that any self-incriminating evidence obtained from a child while still in Juvenile Court may not be used against him in any subsequent criminal proceedings. The farthest the Majority will go in guarding the interests of a child from whom self-incriminating evidence has been wrung, is to say that after a self-incriminating examination, a child's case "perhaps" should not be sent to the criminal court. *"Perhaps"* is a slender thread on which to suspend the constitutional rights of children obtained by their fathers and forefathers through hardship and sacrifice, not excluding the shedding of blood on the battlefields of the nation's wars. The district attorney in his able brief meets this situation quite objectively, and very candidly says: "It may be that after questioning a

child concerning his participation in a crime, the nature of the answers of the child may convince the Juvenile Court judge that the interest of the state require the prosecution of the case on an indictment. If the Juvenile Court judge uses these answers for this purpose, and certifies the case over to the District Attorney, then *there can be no question but that the child was required to incriminate himself, since the effect of his answers directly placed him in jeopardy of criminal prosecution.*"

The 14th Amendment to the Constitution of the United States guarantees to all citizens of the United States due process of law. No State law can abrogate this guarantee. It needs no citation of authority to establish that, included within due process of law, are the right to face one's accuser, to summon witnesses in one's defense, the immunity of self-incrimination, and to employ counsel. Leaving aside the question of a jury trial which this Court held, in the case of *Commonwealth v. Fisher,* 213 Pa. 48, was not required in Juvenile Court procedure, there is nothing in the Juvenile Court Act which deprives minors of the constitutional safeguards above indicated.

Armed robbery is a crime. The Legislature may not, by changing the name of armed robbery to "juvenile delinquency", strip from any citizen the constitutional guarantees which are his when he is tried for armed robbery. If the Legislature may, by a mere change in terminology, take away from a 17-year old boy the safeguards which the parent law of the land assures to him, then it can take it away from 18-year old boys and 25-year old men. Who is to decide the dividing line? I do not believe that the Pennsylvania Legislature ever planned by The Juvenile Court Law to make it easier to convict boys than to convict men. I cannot bring myself to accepting the self-revolting

idea that the Legislature intended that children should be deprived of their liberty on evidence that would walk their grown-up elders triumphantly out of criminal court. If there is anything in The Juvenile Court Law which by fair interpretation sanctions this unconscionable thing, I must say that such an un-American proposition is unconstitutional and I would, therefore, declare it null and void. The scholarly jurist, Judge CRANE of New York, in the case of *People v. Fitzgerald,* 224 N. Y. 307, spoke wisely, bravely and well when he said: "Where, therefore, a child is arrested and charged with being a delinquent child because it has committed an offense which would be a crime in an adult, *that offense must be proved, and proved by competent evidence."*

The Children's Bureau of the U. S. Department of Health, Education, and Welfare, in cooperation with the National Probation and Parole Association and the *National Council of Juvenile Court Judges,* has said in an authoritative pamphlet entitled, "Specialized Courts Dealing with Children," that: *"Rules of evidence calculated to assure proceedings in accordance with due process of law should be applicable to children's cases."* (p. 7) Also: "A juvenile court hearing is sometimes spoken of as 'informal.' Informality should not, however, mean that the court ceases to be a court or becomes merely a conference in the judge's chambers. *Still less should it mean that the court ignores rules of evidence or fails to establish procedures for its actions."* (p. 54)

No attorney appeared on the side of Joseph Holmes until the hearing (the third) of March 6, 1953. This attorney challenged, as he stated in his brief,—". . . the right of the Court to determine delinquency and commit to White Hill in the absence of evidence that appellant's parents had been notified of or had attended

the prior hearings or that the parents were unable or unwilling to afford the required and requisite care and in the absence of admissible evidence in support of all but a minor alleged act of delinquency, operating an automobile without a license, and finally, any and all other reasons which might be assigned after an inspection of the record, which had been denied." All these objections were overruled by the lower court. Taking up the question of the parents' participation or non-participation in the Juvenile Court proceedings the Majority says that "The parents of a child involved in a Juvenile Court proceeding should certainly be notified in regard to what ought to be to them a matter of supreme importance," but it then goes on to say that: "Appellant's repeated derelictions are proof positive of the fact either that his parents were indifferent to his bad behavior or were unable to control him."

The Majority's conclusions in this respect can scarcely be placed in the catalogue of impeccable logic. The absolute lack of trustworthy evidence to establish that Joseph Holmes ever committed robbery, burglary or any other serious crime is now used to show that his parents were indifferent or unable to control him. If Joseph is a bad boy, this should not be reason for charging his parents with indifference. Court records do not carry the cardiograph tracings of the heartache of parents. And if Joseph is as bad as the Majority says he is, is the Juvenile Court, acting as *parens patriae*, to be charged with inability "to control him"?

In taking up the defense attorney's complaint that he was denied the opportunity to examine all the Juvenile Court records on Joseph Holmes, the Majority launches an encomium on out-of-court reports obtained for the purpose of helping judges to impose the proper kind of sentence. No one doubts the helpfulness of reports of this character. But the question here is: Why

wasn't defense counsel allowed to see those reports? Information, data and memoranda obtained *ex parte* do not always represent the apogee of neutrality. Where is the person who by himself or through some relative has not at some time displeased a neighbor or crossed words with a business, scholastic or occupational superior or associate? Reports obtained at residential back doors or in outer business offices without the presence of an impartial referee or the adverse party in interest are always in danger of carrying prejudicial slants resulting from the aroma of feuds which have long smoldered in the dustbin of self-pitying memory or have generated in the hothouse of imaginative hurts. For a judge to sentence on these secret reports without allowing the defendant's attorney to even see them for possible correction or explanation is to impose a sentence based on the utterances of phantoms. Our American traditions of fairness have always rebelled at secret reports, hearings or recommendations. The District Attorney well states this objective situation in his brief as follows: "A sound and thorough inquiry into the needs of the child as well as the state would seem to require scrutiny by the child's counsel of the materials to be used by the court in the determination of ultimate disposition. Although at times, information will be contained in the probation reports which for the child's sake should not be revealed to him, *trust will have to be placed in counsel,* an officer of the court, to not betray the court's confidence or the welfare of the child ... Under our system of jurisprudence, *concealment of facts has never been recognized as an aid to justice."*

I have unstinted admiration for the Juvenile Court system. It has undoubtedly saved countless children from a life of crime. Under no circumstances must we ever go back to the archaic and cruel system which

mingled children with hardened and coarse offenders in both the criminal courts and in the jails. I cannot help but express astonishment at the Majority's statement that the old English law was ever ready to make needy children wards of the State. Instead of citing the case of Shelley's children, I would refer to the writings of Charles Dickens (particularly *Oliver Twist*) in which the sheer brutality in the treatment of unfortunate children makes one truly wonder at the contents of the hearts of both judges and civil administrators in the "good old days."

The law has come a long way in its consideration of the welfare of children since the days of *Oliver Twist*, but that does not mean that perfection has been attained. In its laudable zeal to care for unfortunate children, the State must not become a universal mother. Loving parents in a house with the porch creaking and the paint cracking can still offer more happiness and guidance to children than the most highly trained reformatory superintendent. Before the State can take a child from its parents, it must be determined that he comes within the provisions of the statute enacted by representatives of the people for waifs, misguided minors and tattered children caught between the millstones of economic calamity. The filing of a delinquency petition does not of itself prove that the named minor needs or must have a *parens patriae*. A love of adventure, a careless weighing of possibilities, a mingling with strange playfellows can take an enthusiastic lad into a scrape and a confusion of circumstances which convey the appearance of a culpability not necessarily justified by the true facts. Hence, the imperative need for an inquiry which is organized, scientific and trustworthy, that is to say, a trial with all the safeguards which the centuries have proved to be essential in the business of finding the precious gem of truth.

The country today is plagued with considerable juvenile delinquency. The least effective way to solve that problem is to indiscriminately punish the guilty and the innocent. To charge a juvenile with armed robbery and then send him to a reformatory without legal proof that he has committed that heinous crime is to embitter not only him but all his companions who will feel that they no longer owe any loyalty to an unjust society.

The record of this case does not show that Joseph Holmes committed offenses which would justify the drastic treatment to which he has been subjected. The record clearly demonstrates that he was denied the due process of law which is the heritage of every American, regardless of age, color, sex or national derivation.

I would therefore require a re-hearing on all alleged offenses not constitutionally and legally proved.