488 So.2d 972 (1986)
STATE of Louisiana
v.
Jose M. HERNANDEZ.
No. 85-K-2204.
Supreme Court of Louisiana.
May 20, 1986.
Richard M. Tompson, Tosh & Tompson, Gretna, for defendant-applicant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John M. Mamoulides, Dist. Atty., Dorothy Pendergast, Louise Korns, Eric Honig, Asst. Dist. Attys., for plaintiff-respondent.
CALOGERO, Justice.
Defendant Jose M. Hernandez was convicted on a charge of attempted second degree murder, a violation of La.Rev.Stat. Ann. Title 14 § 27 and Title 14 § 30.1. Thereafter he was sentenced to serve twenty years at hard labor without benefit of probation, parole or suspension of sentence. In a two to one decision, a three judge panel of the Fifth Circuit Court of Appeal, 478 So.2d 1326, affirmed defendant's conviction and remanded the case to the district court for resentencing.[1]
We granted writs because defendant's application presented certain serious complaints, especially as relates to the sufficiency of the evidence to establish that defendant was in fact the perpetrator of the crime. Defendant complains that the essential evidence of his guilt was entirely hearsay (to which his attorney did not object); that a conviction should not be allowed to stand where the only evidence is unobjected to hearsay; that the testimony did not qualify as an exception to the hearsay rule as constituting declarants' excited utterances; and at the very least his conviction should be reversed and a new trial ordered because the trial judge erred in refusing to allow him to give certain relevant *973 testimony, as a consequence of which his substantial right to present a defense was impaired and the jury verdict thereupon made suspect.
For the following reasons we find merit in the last of the aforestated errors, reverse defendant's conviction and remand to the district court for retrial.
The state presented the account of the events surrounding the shooting of one Otto Rickli through the testimony of Cynthia Perez, at whose apartment it occurred. Defendant Jose M. Hernandez, called "Julio", and his wife, Marie Hernandez, had been helping Cynthia and her husband, Emerio "Danny" Perez, move into a rented apartment at 1240 Angus Dr., Apt. C, Harvey, La. A man named Victor Colon also assisted with the moving. During the day more friends had arrived and were drinking with her husband, "Danny". The entire group included Otto Rickli, who was soon to become the shooting victim, Juan Reyes, Victor Sanchez, Victor Colon, the defendant Jose Hernandez, and "Danny" Perez. That evening, after the furniture moving had been completed, Cynthia was upstairs cleaning the apartment. Defendant's wife, Marie, was upstairs with Cynthia. Cynthia asked Marie to go to the store for a gallon of milk. She did so, and left. Cynthia heard an argument between her husband and defendant. According to Cynthia defendant said nothing, but "Danny" told defendant to leave. Defendant did leave the apartment but he soon returned to ask someone for a ride because his wife, Marie, had not yet returned from the store with their car. Victor Colon gave him a ride. Cynthia was hanging curtains at an upstairs window and saw defendant leave with Colon. Before Colon and the defendant, Jose, reached the corner, they encountered Marie returning in the Hernandez vehicle. Jose and Colon thereupon turned around and eventually met Marie in front of the Perez apartment. Cynthia saw Marie move to the passenger side of the car as defendant got behind the wheel. The defendant and his wife, Marie, then left, and Victor Colon came back into the apartment.
Cynthia testified that approximately twenty minutes to a half hour later, while she was still at the upstairs window hanging curtains, she saw defendant and his wife return. Cynthia knocked on the window to get the attention of defendant and his wife, and called downstairs to her husband that Jose and Marie were outside. Cynthia said that "Danny" opened the gate. She admitted, however, that she could not see the gate from the window. The next thing Cynthia heard was the sound of three or four gunshots. When asked where her husband was at the time she heard the shots, she said that he was outside. Cynthia then went downstairs where she saw Otto lying on a couch, bleeding. It took her approximately a minute to descend the stairs because she was nine months pregnant. Julio and his wife were gone. The others were outside "saying that Julio shot him, Otto." The prosecutor asked Cynthia to name those to whom she was referring and she said they were Victor Colon, Victor Sanchez, Juan Reyes and her husband, "Danny".
On cross-examination Cynthia said that she could not see downstairs while she was at the upstairs window, but could hear voices. In response to questions by defense counsel, Cynthia said that the shots came from the living room, not from outside. She added that the living room was directly under the bedroom where she was working. On rebuttal, the prosecutor attempted to determine just how long after she saw defendant and his wife return that Cynthia heard the shots. He asked her to exemplify the time lapse on the witness stand, by saying "stop" when she were to estimate the time lapse. From the time the prosecutor said "Now" until the witness said "Stop" was approximately ten seconds.
Besides Cynthia's hearsay testimony that within minutes after the sound of gunshot the four males told her that the defendant did the shooting, the state's case consisted of two physicians who testified regarding *974 the condition of the victim;[2] and two investigating police officers, Deputy John B. Latimore and Detective Curtis Snow.
Deputy John Latimore testified that on May 15, 1984 he arrived at the Perez apartment in the "neighborhood of eleven, twelve o'clock and saw the victim lying on the sofa with multiple wounds. He secured the scene, separated the witnesses and contacted the Detective Bureau. Latimore testified that he used Cynthia Perez as his interpreter because the others did not speak English, and upon questioning the witness "learned that a subject possibly named Julio had shot the victim." Detective Curtis Snow testified that he received a call at approximately 11:30 P.M., informing him of the shooting. He proceeded to the apartment where he met Deputy Latimore. He testified that he spoke with Deputy Latimore who told him that he (Latimore) had learned that someone named Julio had done the shooting and had fled the scene.
Detective Snow took Victor Sanchez, Victor Colon, "Danny" Perez, Cynthia Perez and Juan Reyes to the Detective Bureau, where he obtained the services of an interpreter to interview them. He testified that the witnesses told him, through the interpreter, that the perpetrator of the shooting worked at Avondale. Detective Snow testified that he secured a photograph of the defendant from Avondale and showed it to Cynthia and Danny Perez who identified the photograph as that of the defendant, Jose Hernandez, "the person that they said had shot this individual." He further testified about a conversation he had with Danny Perez concerning the shooting, in which Perez acknowledged that it was indeed unusual to find Cubans or others of Latin descent, following an incident of this nature, talking so freely to the police. He testified Perez told him that was because "this time the man brought it to my house" (in context "it" referred to the violence). "If he would have taken it out on the street, we wouldn't talk to you, but he brought it to my house this time." "I have my wife and I have my children in there, and nobody does that."
Detective Snow also testified that on the following day he attempted to locate Jose and Marie Hernandez. At the time he was on Terry Parkway in Gretna. He said Jose and Marie Hernandez saw him, drove up in their car with their child, exited their vehicle and asked if he was looking for them. After they identified themselves, Detective Snow placed them under arrest. A search of the defendant's house and car failed to yield a gun or any other incriminating evidence. Similarly a search conducted of the entire first floor whereat the shooting took place, uncovered no weapon. The Detective, however, did not search the second floor of the latter dwelling.
Inexplicably, defendant's attorney, originally court appointed, then retained, did not object to the hearsay testimony of Cynthia Perez, Deputy Latimore, and Detective Snow,[3] which together with testimony of two doctors constituted the entire case of the state.
The ostensible eye witnesses to the crime neither appeared nor testified at trial. Officer Snow said that he "thought" Victor Colon was in Santo Domingo and "Danny" Perez in the Miami area, and that he had no idea where Victor Sanchez or Juan Reyes might be. However, the person no doubt in a better position to know, namely Cynthia Perez, the wife of "Danny" Perez and *975 mother of his two small children, testified simply that her husband had left her and that she did not know where he was. She testified that Victor Colon also left his wife and she, Cynthia, did not know where he was. She testified further that she did not know the whereabouts of Victor Sanchez or Juan Reyes.
Defendant called his wife, Marie as a witness. Marie testified that she was returning to the Perez apartment at approximately 10:25 P.M. from her sister Carmen's place (this latter a minor difference from Cynthia Perez's testimony) when she passed a car. She did not recognize that it was Victor Colon's car because she was not wearing her glasses. The car turned around and both cars reached the Perez apartment at the same time. Defendant left the other car and came to his own. He told his wife to stay in the car because they were leaving. She put the car in park and moved into the passenger seat so that her husband could enter the car. "Danny" Perez, whom the witness described as "kind of drunk," came from the apartment and asked them to stay for a couple of drinks. Marie said that she was tired and did not wish to stay. Defendant told "Danny" the same thing and added that he didn't like being insulted in front of people. Marie said they left at approximately 10:30 P.M. and did not return to the apartment again. As they were leaving, defendant's wife saw Cynthia Perez at the window, hanging curtains. On cross-examination by the state, Marie related what her husband had said about the argument he had had with "Danny" Perez:
Q. Isn't it true that your husband and Danny Perez got into an argument at one point?
A. I couldn't tell you if it was true or not, because my husband, when he got in the car, he had said that he was going to the restroom, and a lot of times when I would be there, he would go and use the restroom and Danny would never insult him; and, according to my husband, he told me that he had insulted him and told him to get out from his house; so that's just exactly what my husband did.
The defendant, who had no prior police record nor prior convictions, took the stand and testified. He denied having shot Otto Rickli, testifying as his wife Marie had, that he and Marie left the apartment at about 10:30 P.M., and did not return that night. To the contrary Cynthia Perez testified that she saw the defendant and his wife arrive about thirty minutes after their earlier departure and shortly before she heard the shots.
The defendant went on to testify that "Danny" Perez, whom defendant had helped all day long moving furniture, threw him out of the apartment because of an incident involving use of the bathroom. This incident and defendant's attempt to testify about it, gave rise to the meritorious assignment of error which prompts our reversal of the conviction. It will be discussed later in this opinion.
Without any of the hearsay testimony the state's proof established only the following:
Defendant Jose, his wife Marie, and Victor Colon had helped Cynthia and "Danny" Perez move into their apartment; later in the evening other friends, namely Juan Reyes, Victor Sanchez and at some point Otto Rickli, arrived at the apartment; they were all drinking; defendant testified that he and "Danny" had an argument over the use of the bathroom and "Danny" "threw" him out of the house, or told him to leave; defendant testified that he and his wife left the apartment at 10:30 p.m. and did not return. However, as noted earlier, Cynthia Perez testified to the contrary on this latter point. Even accepting Cynthia's testimony (over that of defendant and his wife, Marie) that defendant and Marie returned to the apartment after their 10:30 P.M. departure and just seconds before gunshot was heard, the best case for the state excluding the hearsay testimony of Cynthia Perez, Detective Snow and Officer Latimore is that defendant and his wife and three other males were downstairs in or about the apartment so that defendant was one of seven with an opportunity to have shot *976 Otto Rickli, namely, Danny Perez and his wife Cynthia, Victor Colon, Victor Sanchez, Juan Reyes, the defendant Hernandez and his wife Marie.
Relative to the defendant no motive was established, nor was any weapon ever found, or produced. And this was so notwithstanding that the police searched the defendant's automobile and his apartment. Ironically, the police did not search the second floor of the apartment at which the shooting took place.
The hearsay evidence, however, was more direct. That evidence was that four males saw defendant shoot Otto Rickli.
Defendant would have us hold that unobjected to hearsay without more is not enough to sustain a conviction.
While not all jurisdictions agree on this question (see the contrary rule in In re Holmes, 379 Pa. 599, 109 A.2d 523 (1954), cert. denied 348 U.S. 973, 75 S.Ct. 535, 99 L.Ed. 757, an opinion involving a proceeding to determine delinquency of a minor), there is significant authority for the position that unobjected to hearsay without more will not support a conviction. Glenn v. United States, 271 F.2d 880 (6th Cir.1959); Pinkard v. United States, 99 U.S.App.D.C. 394, 240 F.2d 632 (Cir.1956); People v. McCoy, 44 Ill.2d 458, 256 N.E.2d 449 (1970); People v. Hines, 12 Ill.App.3d 582, 299 N.E.2d 581 (1973). Akin to these cases are the following in Texas and Georgia where it has often been held that hearsay evidence is without probative value even if admitted without objection; Germany v. State, 235 Ga. 836, 221 S.E.2d 817 (1976), and cases cited therein; Lumpkin v. State, 524 S.W.2d 302 (Tex.Crim.1975). State v. Allien, 366 So.2d 1308 (La.1978)
In the ordinary case, hearsay evidence to which no objection is lodged constitutes substantive evidence, 79 A.L.R.2d 89-957. In Allien, supra, this Court carved out an exception to that general rule and reversed the defendant's convictions for distribution of a controlled dangerous substance (marijuana) to persons under the age of eighteen. Limited to the particular facts in that case, we held "that unobjected to hearsay which is the exclusive evidence of a defendant's guilt of the crime or an essential element thereof, and where contradicted at trial by the sworn recantation of the out-of-court declarant, is no evidence at all." Allien, 366 So.2d at 1312. In State v. Boutte, 384 So.2d 773 (La.1980) we refused to extend Allien beyond the narrow grounds on which it had been decided.
We find it unnecessary to consider that question again because there is in this case independent error of reversible proportions which will be discussed hereinafter.[4]
Nor are we prepared to hold that the evidence here, including hearsay identification testimony, is insufficient under Jackson v. Virginia to support the conviction. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 560 (1979).
A rational juror making credibility choices favorable to the state could have *977 found defendant guilty on this evidence notwithstanding that it was less than overwhelming and based almost entirely upon hearsay testimony.
Nonetheless, there was a ruling in the case which was wrong, unfavorable to the defendant, and of sufficient magnitude to warrant reversal of the conviction.
Defendant obviously had a significant opportunity for acquittal, considering the state's scant case and absent ostensible eyewitnesses. With no prior record he was able to testify under oath, without fear of impeaching prior convictions. He testified that he and his wife left the Perez apartment at 10:30 P.M., upset enough at Emerio "Danny" Perez not to want to return. They, defendant and his wife, along with others, had helped Perez move furniture all day long. Defendant had used Perez's bathroom with apparent and actual permission on several occasions during the day, and then on one last occasion he was scolded by Perez for going into the bathroom.
As defendant was relating the incident which provoked Perez to order him to leave, the prosecutor objected:
A. He, Emerio, threw me out of the house, I had gone to the bathroom on several occasions, but the last time I went, something bothered him. They were doing something in the bathroom and he didn't let me go in. When I opened the door, he
MR. HONIG:
Objection, your Honor. May I have the jury excused.
The judge excused the jury to allow the prosecutor to argue the matter. The prosecutor said that he was objecting to this line of testimony because defendant was about to make a claim regarding "bad acts" or "possible criminal activity" and the witnesses were not there to be cross-examined about this. The judge asked to hear what defendant was going to say and defendant continued:
He then camehe came right there and then and told me not to go in there. They were doing something and I was not supposed to be involved. After this, I told Victor to please take me home because Danny had thrown me out. Victor then said, "Just wait a couple of minutes and I'll take you home." He then came and we got out and we then left in his car, about a block or two away we saw my wife coming back in our car.
At this point the prosecutor said that defendant had not said what he had expected him to say. Almost immediately defendant said: "What I saw that was going on in there must have been some of that cocaine." The prosecutor told the judge that this was the testimony to which he was objecting and the judge cautioned defendant that he could not say that they were dealing cocaine. The judge added that defendant could say "there was something going on but he [could not] say what they were doing, becauseand there's no way to verify that or to deny it."
Apparently defendant was about to testify that he entered the bathroom and saw some sort of drug related transaction taking place. Had he been able to testify as he chose, he would have added support to his and his wife's contention that he had been seriously scolded by "Danny" Perez, prompting him to be sufficiently upset as to depart from the apartment without desire to return. He would also have gotten before the jury a reason for the shooting incident, drug dealing at the apartment, in which he was not a participant.
The state objected for the implausible reason that defendant was about to make a claim regarding "bad acts" or "possible criminal activity" and the witnesses were not there to be cross-examined about this. After the defendant related what it was he proposed to say about the bathroom incident the trial judge told defendant he could not testify that they were dealing cocaine. The judge added that defendant could say "there was something going on, but he (could not) say what they were doing because... there's no way to verify it or deny it." Thereafter defendant testified in the presence of the jury, but without being *978 permitted to relate what he observed taking place in the bathroom.
A defendant's right to present a defense is sanctioned constitutionally. He can testify to, or give evidence, on any relevant matter. Relevant evidence is that which tends to show the commission of the crime and the intent, or that which tends to negative the commission of the offense and the intent. R.S. 15:441. R.S. 15:441 continues: "Facts necessary to be known to explain a relevant fact or which support an inference raised by such facts, are admissible." According to La.R.S. 15:442 "the relevance of evidence must be determined by the purpose for which it is offered ..." As this Court said in State v. Whittaker, 463 So.2d 1270, 1272 (La.1985): "Evidence is relevant which makes any fact indicating guilt or innocence more or less probable."
The ruling of the trial judge barring testimony by the defendant on a relevant matter was clearly wrong. And it did adversely "affect [a] substantial right of the accused." C.Cr.P. art. 921.

Decree
For the foregoing reasons the conviction and the sentence of defendant Jose M. Hernandez is reversed and the case is remanded to the district court for such further proceedings by the state as are deemed appropriate, including re-trial.
REVERSED; REMANDED.
DIXON, C.J., concurs. The hearsay evidence was clearly inadmissible, and the Jackson v. Va. standard has not been met.
WATSON, J., dissents.
NOTES
[1] As a patent error the Court of Appeal found the sentence illegal in that the trial court required the sentence to be served without benefit of parole, probation, or suspension of sentence, citing R.S. 14:27 D(1) and State v. See, 467 So.2d 525 (La.1985). Because the without benefit imposition was not supported by the appropriate statute the Court of Appeal found it necessary to set aside the sentence and remand to the trial court for resentencing.
[2] The staff physician at Villa Feliciana Hospital testified that victim was a paraplegic, blind and with a permanent tracheotomy who could not be moved to the court room and who "(talked) with a soft voice and sometimes he's hard to understand ..."
[3] The record reflects that three witnesses gave hearsay testimony, and in each instance no objection was made nor discussion had concerning res gestae or excited utterance. Defendant complains in brief that the trial judge should not have denied his Motion for Continuance and urged that the trial court should not have gone forward in the absence of eye witnesses. Nowhere in the transcript does that Motion for Continuance or a colloquy in connection therewith (which conceivably might have included a court ruling on the admissibility of the hearsay testimony, res gestae or excited utterance) appear.
[4] We also find it unnecessary to determine whether Cynthia Perez's testimony, reciting that four others told her that defendant shot the victim, was admissible as an exception to the hearsay rule because part of the res gestae or an excited utterance. The close question in assessing the propriety of the state's effort to employ the excited utterance exception to the hearsay rule is whether the four declarants had personally observed the event about which they purportedly made factual utterances. See State v. Bean, 337 So.2d 496, 497 (La.1976). Favorable to the state, and in accordance with Cynthia Perez's testimony, the four ostensibly made the utterances within a short time after the occurrence when Cynthia descended the stairs, and under circumstances where it possibly appeared that the declarants had had an opportunity to observe the shooting. On the other hand it can be argued that whether the identity of the assailant was based on personal observation is not disclosed in the context of the utterances or in a foundation for their admission. Bean, supra, 337 So.2d, at 498. And four simultaneous excited utterances in a case pregnant with the possibility of a frameup (note that the dissenting judge in the Court of Appeal said "the facts of this case strongly suggest that appellant was `framed'"), just might militate against applying the exception to the hearsay rule. In any event, as we indicated above, it is not necessary for us to resolve that question in light of the fact that we reverse the conviction on an independent, meritorious assignment of error.