546 A.2d 1149

In the Interest of Harvey DAVIS.

**Appeal of Harvey DAVIS.**

Superior Court of Pennsylvania.

Argued Nov. 9, 1987.

Filed Aug. 16, 1988.

48

Karl Baker, Assistant Public Defender, Philadelphia, for appellant.

Before CIRILLO, President Judge, and CAVANAUGH, ROWLEY, WIEAND, McEWEN, OLSZEWSKI, BECK, TAMILIA and POPOVICH, JJ.

WIEAND, Judge:

In this proceeding to review the probationary status of a juvenile because of "problems in the home," the court revoked probation and ordered the juvenile committed based on his probation officer's testimony, over objection,[1] that "[the juvenile's] father advised me that [the juvenile] pulled a knife on him." On appeal, the juvenile contends that his probation was revoked improperly and he was deprived of his liberty on the basis of hearsay testimony without an opportunity to confront his accuser.

Harvey Davis had been adjudicated delinquent on May 6, 1985 on a charge of simple assault. At the dispositional hearing, he had been placed on probation upon the condition that he attend school, with no absences, lateness, or suspensions.

1. The objection, although general, was adequate to preserve the court's evidentiary ruling for appellate review. Where only a general objection is made, the admission of the evidence is not ground for reversal if it is proper for any purpose. *Commonwealth v. Bell,* 288 Pa. 29, 35, 135 A. 645, 647 (1927); *Commonwealth v. Marshall,* 287 Pa. 512, 521, 135 A. 301, 304 (1926); *Fischer v. Anderson,* 173 Pa.Super. 175, 179, 96 A.2d 168, 170 (1953). See also: Henry on Pennsylvania Evidence, § 724. The better practice is to state specifically the reason for the objection. When this is done, all other reasons for excluding the evidence are deemed waived. *Commonwealth ex rel. Wilkes v. Maroney,* 423 Pa. 113, 119, 222 A.2d 856, 860 (1966); *Commonwealth v. Markwich,* 178 Pa.Super. 169, 172, 113 A.2d 323, 325 (1955); *Huffman v. Simmons,* 131 Pa.Super. 370, 375, 200 A. 274, 276 (1938).

On August 28, 1985, Davis's probation officer filed a motion to review the order of probation, with a request that Davis be committed to Glen Mills Diagnostic Center, because of "problems in the home and [Davis] appears to be in need of an extensive diagnostic study."

At the revocation hearing, the following occurred:

PROBATION OFFICER: ... I got involved with the case because of [Harvey's] father some time ago, and there was quite a bit of disturbance in the home between Harvey and his father and Harvey's father advised me that Harvey pulled a knife on him—

DEFENSE ATTORNEY: Objection, respectfully.

THE COURT: Overruled.

PROBATION OFFICER: And he protected himself, and that there were threats against Harvey and Harvey didn't want to stay home, and as a result of that, I felt it was the best thing to bring the case back to court ...

At the conclusion of the hearing, Davis's counsel renewed his objection to the hearsay testimony of the probation officer and argued that no basis for revocation had been presented. The court revoked probation and committed appellant to the Glen Mills Diagnostic Center.

On appeal, Davis argues that his right to confrontation under the state and federal constitutions was violated when the trial court based its decision to revoke probation solely on the hearsay testimony of the probation officer.[2] We agree and reverse.

■ The Juvenile Act in Pennsylvania, 42 Pa.C.S. § 6301 et seq., provides specifically that in adjudicatory proceed-

---

**2.** The probation officer also testified, in response to an inquiry by the court, that Davis had been absent from school. Davis's attorney objected to this testimony on the ground that Davis had had no prior notice that he was being charged with violating probation because of absence from school. The court overruled the objection, stating, "It is additional information." Appellant argues that this was error. In its opinion, however, the juvenile court has stated that it did not consider this testimony and that it did not have any effect on its decision to revoke the juvenile's probation. Therefore, we find it unnecessary to review this aspect of appellant's hearing.

ings, extrajudicial statements which would be constitutionally inadmissible in a criminal proceeding shall not be used against a juvenile. See: 42 Pa.C.S. § 6338(b). In dispositional hearings, however, the statute provides that "all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition." 42 Pa.C.S. § 6341(d). With respect to probation revocation hearings, the Act is silent. See: 42 Pa.C.S. § 6324(5). For constitutional reasons hereinafter stated, however, we hold that a juvenile's probation cannot be revoked solely on the basis of extrajudicial statements made by an accuser whom the juvenile has not been permitted to confront.

The leading decision regarding the constitutional safeguards which are applicable to juveniles is *Application of Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The Supreme Court there observed:

> Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts.... The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure but in arbitrariness.

*Id.* at 18–19, 87 S.Ct. at 1438–1439, 18 L.Ed.2d at 541. Therefore, the Court determined that certain fundamental due process rights which had been recognized in adult criminal proceedings were applicable also in juvenile proceedings. The Court reasoned that a balance had to be struck between fundamental procedural protections and the

goals of the juvenile court system to ensure that juvenile proceedings "measure[d] up to the essentials of due process and fair treatment." *Id.* at 30, 87 S.Ct. at 1445, 18 L.Ed.2d at 548. With respect to the adjudicatory phase of a juvenile proceeding, the Court held, an alleged juvenile offender is entitled to receive notice of the charges, to be represented by counsel, to confront his accuser, to cross-examine witnesses, and to be free of the constraints of self-incrimination. In addition, proof beyond a reasonable doubt has been held necessary in order to adjudicate a juvenile delinquent. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Double jeopardy principles are also applicable to juvenile proceedings. *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). However, the Constitution does not guarantee the right to trial by jury in juvenile proceedings. *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

■ Because a juvenile is entitled to confront his accuser, an adjudication of delinquency which is based solely on hearsay evidence will be reversed. *In Interest of LaMore*, 356 Pa.Super. 322, 514 A.2d 633 (1986); *Commonwealth v. McNaughton*, 252 Pa.Super. 302, 381 A.2d 929 (1977).

In *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court held, in the context of adult proceedings, that a parolee had a substantial interest in retaining liberty until it had been determined that he had violated the conditions of his parole and that, therefore, parole could not be revoked absent due process. Although "the full panoply of rights" is not available, the Court said, a structured procedure, albeit informal, is necessary to assure that a revocation of parole will not be based on unverified facts or an inaccurate analysis of the circumstances. Thus, the Court formulated a two step procedure. The first step, similar to a preliminary hearing, is a factual inquiry to determine the existence of probable cause. The second step combines the factfinding function with the exercise of discretion to determine whether revocation of parole is necessary. In both proceedings, there exist condi-

tional rights to confront accusers and cross-examine witnesses. In the first step, these rights must be recognized unless it is determined that disclosure of the identity of an informant will create a risk of harm to him. In the second step, the right to confront and cross-examine an accuser can be denied only upon a finding of good cause.

These rights are also accorded to an adult probationer in proceedings to revoke probation. In *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Supreme Court said, "Probation revocation is not a stage of a criminal prosecution, but does result in a loss of liberty." *Id.* at 783, 93 S.Ct. at 1760, 36 L.Ed.2d at 661–662. Therefore, "a probationer can no longer be denied due process ... [on the ground] that probation is an 'act of grace.' " *Id.* at 783 n. 4, 93 S.Ct. at 1760 n. 4, 36 L.Ed.2d at 662 n. 4. See also: *Commonwealth v. Kavanaugh*, 334 Pa.Super. 151, 482 A.2d 1128 (1984).

The appellate courts in Pennsylvania have held unequivocally that "probation revocation proceedings entail the right to confront and cross-examine accusers." *Commonwealth v. Riley*, 253 Pa.Super. 260, 267, 384 A.2d 1333, 1336 (1978). "[B]efore hearsay testimony may be admitted, the hearing judge must make a finding that there is good cause for not allowing confrontation." *Commonwealth v. Holmes*, 268 Pa.Super. 396, 399, 408 A.2d 846, 848 (1979). See also: *In the Interest of Bonner*, 301 Pa.Super. 431, 447 A.2d 1043 (1982); *Gartner v. Comm., Penna. Bd. of Probation and Parole*, 79 Pa.Cmwlth. 141, 469 A.2d 1371 (1983).

A juvenile has the same substantial interest in retaining his liberty as an adult. See: *State ex rel D.E. v. Dougherty*, 298 S.E.2d 834 (W.Va.1982). Similarly, society's interests in a juvenile probationer are no different than its interests in an adult probationer or parolee. It has been said that:

[a] parolee is not the only one who has a stake in conditional liberty. Society has a stake in whatever may be the chance of restoring him to a normal and useful life within the law. Society thus has an interest in not having

parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of conditions.

*Morrissey v. Brewer, supra* at 484, 92 S.Ct. at 2601, 33 L.Ed.2d at 496.

■ In view of the substantial liberty interests which exist in not having probation revoked on the basis of unverified facts or erroneous information, we conclude that due process considerations entailing the right to confront and cross-examine an accuser must extend to probation revocation proceedings for a juvenile. In *Gault*, the Supreme Court said:

The informality of juvenile court hearings frequently leads to the admission of hearsay and unsworn testimony. It is said that "close adherence to the strict rules of evidence might prevent the court from obtaining important facts as to the child's character and condition which could only be to the child's detriment." The assumption is that the judge will give normally inadmissible evidence only its proper weight. It is also declared in support of these evidentiary practices that the juvenile court is not a criminal court, that the importance of the hearsay rule has been overestimated, and that allowing an attorney to make "technical objections" would disrupt the desired informality of the proceedings. *But to the extent that the rules of evidence are not merely technical or historical, but like the hearsay rule have a sound basis in human experience, they should not be rejected in any judicial inquiry.*

*Application of Gault, supra* 387 U.S. at 11 n. 7, 87 S.Ct. at 1435 n. 7, 18 L.Ed.2d at 537 n. 7, quoting, Note, *Juvenile Delinquents: The Police, State Courts, and Individualized Justice,* 79 Harv.L.Rev. 775, 794–795 (1966) (footnotes omitted) (emphasis added). By ignoring the hearsay exclusion, "[t]he great engine of cross-examination would lie unused while error and perjury would travel untrammeledly to an unreliable and often tainted judgment." *Johnson v. Peoples Cab Co.,* 386 Pa. 513, 514, 126 A.2d 720, 721 (1956).

There can be no benefit to the juvenile, to society, or to the integrity of the juvenile court system to permit Davis's probation to be revoked solely on the basis of a hearsay declaration by his father without requiring the father to appear and be cross-examined. The goals of the juvenile system will not be defeated or even threatened by wrapping probation revocation proceedings in the same safeguards which apply to adult revocation hearings in order to insure the reliability of the information upon which a court is required to act. We conclude, therefore, that it was error to base the revocation of appellant's probation solely on an extrajudicial statement made by appellant's father to appellant's probation officer.

The order revoking appellant's probation · is reversed.

CIRILLO, President Judge, files a dissenting opinion, in which OLSZEWSKI, TAMILIA and POPOVICH, JJ., join.

CIRILLO, President Judge, dissenting:

I respectfully dissent from the majority opinion. Although I agree that an adult in a revocation of probation hearing has the right to confront and cross-examine adverse witnesses absent a showing of good cause, I cannot embrace the majority's assertion that juveniles are entitled to this same right. Rather, an examination of applicable statutory and case law, as well as a consideration of the purposes and procedures of the juvenile system, leads me to the conclusion that juveniles have a more limited right to confrontation in probation revocation proceedings than do adults.

In Pennsylvania, juvenile matters are governed by a chapter contained in Pennsylvania Consolidated Statutes at 42 Pa.C.S. §§ 6301–6365. Although this chapter, known as the Juvenile Act, authorizes a juvenile court to impose probation upon a child found to be delinquent, 42 Pa.C.S. § 6352, and provides that "[a] child may be taken into custody ... [b]y a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to

believe that the child has violated conditions of his probation," 42 Pa.C.S. § 6324, it does not specifically enunciate the rules and procedures to be applied in probation revocation hearings. *See* F. McCarthy, *Pennsylvania Juvenile Delinquency Practice & Procedure* § 14–2 (1984). However, by considering the Juvenile Act in its entirety, the procedure and rules which the legislature intended to be applicable in probation revocation proceedings can be surmised.

In construing the provisions of the Juvenile Act, I am mindful of the Act's admonition that its provisions are to be interpreted to effectuate its purposes, one of which is "to remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefor a program of supervision, care and rehabilitation." 42 Pa. C.S. § 6301(b)(2). The Juvenile Act divides juvenile proceedings involving delinquents into two types: adjudicatory and dispositional. The adjudicatory hearing is concerned with determining whether a child is innocent or guilty of committing the delinquent act or acts of which he or she is accused. If the child is found to have committed the acts, then a disposition hearing is held to determine whether the child is in need of treatment, supervision or rehabilitation. If the court finds that the child is in such need, then it chooses from various alternative disposition orders the one most likely to meet that need.

Subchapter "C" of the Juvenile Act specifically addresses the procedures and safeguards to be utilized at hearings under that chapter. Among its provisions, this subchapter specifically entitles a juvenile to the right to counsel, the right to introduce evidence and to be heard in his or her own behalf, the right to cross-examine witnesses, and the right not to be a witness against oneself. *See* 42 Pa.C.S. §§ 6337, 6338(a) & (b). However, section 6303 of subchapter "A" limits the scope of the Juvenile Act as follows:

(a) **General rule.**—This chapter shall apply exclusively to the following:

(1) Proceedings in which a child is alleged to be delinquent or dependent.

(2) Transfers under section 6322 (relating to transfer from criminal proceedings).

(3) Proceedings arising under Subchapter E (relating to dispositions affecting other jurisdictions).

(4) Proceedings under the Interstate Compact on Juveniles, as set forth in section 731 of the act of June 13, 1967 (P.L. 31, No. 21), known as the "Public Welfare Code." ...

The procedures and safeguards delineated under subchapter "C" are applicable only to the proceedings within the scope of the chapter. Notably absent from the proceedings listed under this section is any reference to disposition or probation revocation hearings. The Act, however, does not leave us totally in the dark regarding the procedures to be employed at disposition hearings. Subsection "d" of section 6341 explains the type of evidence which is to be considered in disposition hearings:

(d) **Evidence on issue of disposition.**—In disposition hearings ... all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition. The parties or their counsel shall be afforded an opportunity to examine and controvert written reports so received and to cross-examine individuals making the reports. Sources of information given in confidence need not be disclosed.

42 Pa.C.S. § 6341(d) (1982). Clearly, this section provides for the admission of hearsay evidence in disposition hearings, limiting the juvenile's right of confrontation in such hearings to the right to cross-examine the authors of reports and denying the right to confront third parties whose input was considered in those reports. This conclusion is supported by the Official Comment to section 6302 of the Act wherein it states:

Before the child can be characterized a 'delinquent child' he must be found (1) to have committed a 'delinquent act' and (2) to be in need of treatment or rehabilitation. The first finding is made in the adjudicative hearing on the merits of the allegations of delinquent acts ascribed to the child and involves all of the due process of law safeguards prescribed by *Gault* [387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ]. The second finding is made in the dispositional hearing and involves the 'good will and compassion' of the 'kindly juvenile judge,' taking into account the 'emotional and psychological attitude' of the child and *having greater latitude in the information he may consider in making a disposition of the case. . . .* 42 Pa.C.S. § 6302 (Supp.1987) (emphasis added). The clear import of this Official Comment is that although at the adjudicative hearing the safeguards of due process contained in subchapter "C" of the Juvenile Act apply, at the disposition hearing they do not.

Since the right to confrontation is limited in disposition hearings, it should also be limited in probation revocation proceedings, which are held to determine if modification of the original disposition order is necessary. Modification of an order may be necessary because of a child's failure to abide by the terms of the probation order, because there has been some change in a child's circumstances, or because new information about a child's situation has come to light. As in disposition hearings, the focus in probation revocation hearings is on determining what course of action is best suited for the rehabilitation and treatment of the child. Logically, then, a juvenile should not be granted more rights in a hearing to determine whether modification of an original disposition order is necessary than in the original disposition hearing itself.

Comparison of our Juvenile Act with the juvenile act of Georgia, Ga.Code Ann. § 15–11–1 to 15–11–65 (1985 & Supp.1987), persuades me that our legislature intended this result. Both of these juvenile acts were modeled after the Uniform Law Commissioners' Model Juvenile Court Act.

*See* 9 Uniform Laws Annotated (1987). In addition, Pennsylvania and Georgia are among the three jurisdictions listed in the Model Juvenile Act's table of jurisdictions which have adopted it. Furthermore, this table of jurisdictions is included within the section on the Juvenile Act in Pennsylvania Consolidated Statutes Annotated. *See* 42 Pa. C.S.A. §§ 6301–6365 (Supp.1987). Our Juvenile Act defines "delinquent act" as:

    (1) The term means an act designated a crime under the law of this Commonwealth, or of another state if the act occurred in that state, or under Federal law, or under local ordinances.

    (2) The term shall not include:

    (i) the crime of murder; or

    (ii) summary offenses, unless the child fails to pay a fine levied thereunder, in which event notice of such fact shall be certified to the court.

42 Pa.C.S. § 6302 (1982). Georgia's juvenile act, on the other hand, defines "delinquent act" to mean:

    (A) An act designated a crime by the laws of this state, or by the laws of another state if the act occurred in that state, under federal laws, or by local ordinance and the crime does not fall under subparagraph (C) of paragraph (12) of this Code section and is not a juvenile traffic offense as defined in Code Section 15–11–49;

    (B) *The act of disobeying the terms of supervision contained in a court order which has been directed to a child who has been adjudged to have committed a delinquent act:* or ...

Ga.Code Ann. § 15–11–2(6) (Supp.1987) (emphasis added). By including probation violations in the definition of "delinquent act," Georgia's legislature made it clear that probation revocation hearings are adjudicative hearings. *See also K.E.S. v. Georgia,* 134 Ga.App. 843, 216 S.E.2d 670 (1975) (hearings in juvenile court seeking to terminate probation must be treated as delinquency trials). If the Pennsylvania Legislature had intended probation revocation hearings to be conducted under the rules applicable to

adjudicative rather than dispositional hearings, it could have simply included the violation of probation as part of the definition of "delinquent act," as was done by the Georgia legislature.

Even if, however, the legislature's intent in not specifically enunciating the procedure and rules applicable to probation revocation hearings in the Juvenile Act was to leave the promulgation of such procedures and rules to the courts, I would nevertheless find that juveniles do not have the right to confrontation at probation revocation hearings. I would do so in recognition of the juvenile judge's need, in considering a modification of a child's disposition, to have available to him the full range of information to which he had legal access in making that disposition originally.

In determining how to rehabilitate and treat a juvenile, a juvenile judge depends greatly on the oral and written reports of probation officers, social workers and various other professionals who function as a support staff for the juvenile. Many times, these personnel turn to people involved in a child's daily life, such as his or her family, friends, and teachers to find out how the child is getting along. The information they gain from speaking with these people is often included in the reports they deliver to the court. With this information, the judge is made aware of the child's progress or lack thereof, and is able to determine whether a modification of the original disposition order is necessary. If juveniles were afforded full confrontation rights at probation revocation hearings, the admissibility of these reports would be severely limited. This result would greatly impede the ability of the juvenile justice system to achieve its goal of rehabilitating and treating the children who enter its gates. I do not think such a result would benefit either juveniles or our society as a whole. *Accord Matter of L.J.M.,* — Ind.App. —, 473 N.E.2d 637 (1985) (finding no merit in the appellant's contention that hearsay was improperly admitted in his juvenile probation revocation hearing, the Indiana Court of Appeals reasoned that excluding hearsay evidence in disposition hearings would in

many cases disserve the child by excluding relevant information that might support a less restrictive disposition). Accordingly, I would find that in juvenile probation revocation hearings, juveniles are not entitled to a right of confrontation beyond that expressly delineated by 42 Pa.C.S. § 6341(d).

The analysis is not complete, however, without ascertaining whether it is constitutional to limit a juvenile's right to confrontation in a probation revocation hearing. First, I will examine the right of confrontation afforded adults in probation revocation proceedings. The United States Supreme Court formulated the present law on this right in two cases. In *Morrissey v. Brewer, supra,* the Supreme Court established the minimum constitutional requirements applicable to parole revocation hearings. Then, in *Gagnon v. Scarpelli, supra,* the Supreme Court extended the requirements formulated in *Morrissey* to probation revocation hearings. The Court reasoned that there was no difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation. 411 U.S. at 782, 93 S.Ct. at 1759.

In *Morrissey,* the Supreme Court observed that there are two important stages in the typical process of parole revocation. The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer; the second stage occurs when parole is formally revoked. At the first stage, according to the Supreme Court, due process requires that a minimal inquiry be conducted to determine whether there is probable cause to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions. Furthermore, the Supreme Court determined that at the preliminary hearing stage, a probationer or parolee is entitled to notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decision maker, and a written report of the hearing. *Gagnon,* 411 U.S. at 786, 93 S.Ct. at 1761; *Morrissey,* 408 U.S.

at 485–87, 92 S.Ct. at 2602–03. Describing the conditional right of confrontation afforded parolees and probationers at this first stage, the Supreme Court stated:

On request of the parolee, persons who have given adverse information on which parole revocation is to be based are to be made available for questioning in his presence. However, if the hearing officer determines that the informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination.

*Morrissey*, 408 U.S. 487, 92 S.Ct. at 2603. At the second stage, the Supreme Court ruled, there must also be an opportunity for a hearing, if it is desired by the parolee, prior to the decision to revoke parole. This hearing, the Supreme Court declared, must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The minimum due process requirements of such a hearing, the Court instructed, are: (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the fact finders as to the evidence relied on and reasons for revoking parole. *Morrissey*, 408 U.S. at 488–89, 92 S.Ct. at 2604.

In *Commonwealth v. Kavanaugh*, 334 Pa.Super. 151, 482 A.2d 1128 (1984), this court acknowledged and discussed the Supreme Court's direction in *Morrissey* and *Gagnon* regarding the procedure required by due process in probation revocation hearings. We recognized that the extent of a probationer's right to confrontation is dependent upon whether the hearing is a Gagnon I hearing, meaning the hearing required at the first stage of the revocation pro-

cess, or a Gagnon II hearing, the hearing required at the second stage of the process. We stated:

The conditional right to confront adverse witnesses, afforded in a Gagnon I hearing is not the same as the right to confront adverse witnesses afforded in a Gagnon II hearing. In the former, the hearing officer need not specifically find good cause for not allowing confrontation. In the latter, although it is not such a highly formal procedure that it must be conducted in accordance with the entire gamut of evidentiary and procedural rules employed in a criminal trial ... the hearing officer is required to make a finding that there is good cause for not allowing confrontation before hearsay evidence may be admitted.

*Id.,* 334 Pa.Superior Ct. at 156, 482 A.2d at 1130 (citations omitted). The import of *Morrissey, Gagnon,* and *Kavanaugh* is that adults are entitled to some right to confront adverse witnesses in all probation revocation hearings, the extent of the right depending on the type of hearing involved. Whether this right of confrontation extends to juveniles in probation revocation hearings, however, is yet to be resolved.

Neither the provisions of the Pennsylvania Constitution nor those of the United States Constitution, which Davis asserts guarantee the rights to confrontation and cross-examination in probation revocation proceedings, can be utilized as authority for the proposition that these rights extend to juvenile probation hearings. Indeed, contrary to Davis's contention, these provisions provide no guarantee for anyone, adult or juvenile, of the right to confrontation at revocation proceedings. As is apparent from their very wording, the provisions apply only to criminal prosecutions. Moreover, in both *Morrissey* and *Gagnon,* the Supreme Court emphasized that neither parole nor probation revocation hearings are the equivalent of criminal prosecutions. *See Morrissey,* 408 U.S. at 989, 92 S.Ct. at 2604 ("[T]he revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such

a proceeding does not apply to parole revocations.... Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions"); *Gagnon*, 411 U.S. at 789, 93 S.Ct. at 1763 (addressing the issue of whether indigents have a due process right to be represented by counsel in all probation or parole revocation cases, the Court declared: "[W]e deal here, not with the right of an accused to counsel in a criminal prosecution, but with the more limited due process right of one who is a probationer or parolee only because he has been convicted of a crime").

The Supreme Court has addressed the procedural rights of juveniles in five notable decisions beginning with *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). *See* S. Davis, *The Rights of Juveniles, The Juvenile Justice System* 7-1 to 7-12 (2d ed. 1987); Note, *Juvenile Law—What Ever Happened to In Re Gault and Fundamental Fairness in Juvenile Delinquency Proceedings?— Schall v. Martin*, 22 Wake Forest L.Rev. 347, 349 & n. 22 (1987). In *Kent*, the Supreme Court held that a District of Columbia juvenile court order waiving that court's exclusive jurisdiction over a juvenile and directing his prosecution as an adult in federal district court was invalid. The Court instructed that "as a condition to a valid waiver order, petitioner was entitled to a hearing, including access by his counsel to the social records ... presumably ... considered by the court, and to a statement of reasons for the Juvenile Court's decision." *Id.* at 557, 86 S.Ct. at 1055. As part of its discussion, the Supreme Court briefly reviewed the history of the juvenile justice system in America, raising the question of whether the constitutional guarantees applicable in criminal proceedings must be applied in juvenile court proceedings. The Court declined to answer this question, though, noting that it was unnecessary to do so to resolve the matter before it.

Such was not the case with *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *In Re Gault* involved a

fifteen-year-old boy who was adjudicated a juvenile delinquent for making lewd phone calls. As Gault's disposition, the court committed him to an industrial school for the period of his minority, "unless sooner discharged by due process of law." *Id.* at 7–8, 87 S.Ct. at 1433. The corresponding penalty for an adult guilty of the same behavior as Gault was a fine ranging from five to fifty dollars, or imprisonment for not more than two months.

Beginning its review of Gault's adjudication as a delinquent, the Supreme Court addressed the question of whether, to meet constitutional standards, the full panoply of rights normally associated with due process of law must be accorded in proceedings in which courts adjudicate juveniles delinquent and commit them to institutions. With the recognition that a number of courts answered this question in the affirmative followed by a curt review of its case law, the Supreme Court concluded that "whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." *Id.* at 13, 87 S.Ct. at 1436. Having reached this conclusion, however, the Supreme Court opened itself up to the problem of "ascertaining the precise impact of the due process requirement upon such proceedings."

The Supreme Court embarked upon its analysis of this problem by recapitulating the emergence of the parens patriae philosophy in the juvenile court system and examining the practical effect it has had thereon. Describing the inception of the juvenile court system, the Court stated:

> The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career." ... The

apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded.... The child was to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

These results were to be achieved ... by insisting that the proceedings were not adversary, but that the state was proceeding as parens patriae.

*Id.* at 15–16, 87 S.Ct. at 1437. This parens patriae philosophy, however, faltered in effectuating the desired results. As observed by the Supreme Court:

The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness.

*Id.* at 18–19, 87 S.Ct. at 1439. Consequently, the Supreme Court stated that although delinquency proceedings need not conform with all of the requirements of a criminal trial or even of the usual administrative hearing, they "must measure up to the essentials of due process and fair treatment." Due process and fair treatment, the Supreme Court reasoned, entitles juveniles to written notice of the charges against them, notification of the right to counsel, the right to confront and cross-examine witnesses, and the privilege against self-incrimination.

That *In Re Gault* grants substantial rights to juveniles that they never before were given, including the rights to confrontation and cross-examination, is not disputed; however, as the Supreme Court emphasized throughout its decision, the effect of *In Re Gault* upon juvenile's rights is limited to the *delinquency* stage of juvenile proceedings. Illustrative of this point, is the Supreme Court's categorical statement at the beginning of its analysis that:

We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile "delinquents." For example, we are not here concerned with the procedures or constitutional rights applicable to the prejudicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process.

*Id.* at 13, 87 S.Ct. at 1436. Expounding further on this limitation, the Supreme Court stated: "The problems of pre-adjudication treatment of juveniles, and of post-adjudication disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process." *Id.* at 31 n. 48, 87 S.Ct. at 1445 n. 48. Thus, in carving out the constitutionally protected procedural rights of juveniles in adjudicatory hearings, the Court acknowledged that its reasoning and holding were fashioned around the distinct characteristics of the delinquency hearing and should not be relied upon as a basis for holding the same procedural rights applicable to post-adjudicative proceedings.

Several years after *In Re Gault,* the Supreme Court added to the list of "essentials of due process and fair treatment" accorded juveniles by holding that proof beyond a reasonable doubt is required in adjudicatory proceedings when a juvenile is charged with an act which would constitute a crime if committed by an adult. *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In doing so, the Supreme Court made clear, as it had in *In Re Gault,* that it was not concerned with the pre-judicial nor post-adjudicative stages of the juvenile process. *Id.* at 359 n. 1, 90 S.Ct. at 1070 n. 1. On this point, the Court instructed:

Use of the reasonable-doubt standard during the adjudicatory hearing will not disturb New York's policies that a finding that a child has violated a criminal law does not constitute a criminal conviction, that such a finding does

not deprive the child of his civil rights, and that juvenile proceedings are confidential. Nor will there be any effect on the informality, flexibility, or speed of the hearing at which the fact finding takes place. *And the opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment will remain unimpaired.*

*Id.* at 366, 90 S.Ct. at 1074 (emphasis added). With this passage, the Supreme Court reaffirmed the notion that informal proceedings should be the norm in juvenile proceedings and that varied evidence reflecting upon a juvenile's background should be considered in determining the type of disposition especially conducive to rehabilitating each youngster appearing before the court.

Subsequently, in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Supreme Court held that a right to trial by jury in the juvenile court's adjudicative stage is not constitutionally required by the due process clause of the fourteenth amendment. In reaching this holding, the Supreme Court recommitted itself to the posture that it had previously embraced in *Gault* and *Winship* of refraining from "taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding," *id.* at 545, 91 S.Ct. at 1986, attempting instead to balance the desirability of preserving the unique characteristics of the juvenile system with the beneficial effects of procedural orderliness. Striking this balance in *McKeiver*, the Supreme Court reasoned that requiring trial by jury in adjudicatory hearings would run the risk of remaking the juvenile proceeding into a fully adversary process, thereby abandoning the ideal of the juvenile court system as an intimate, informal, protective setting. *Id.*

In its fifth notable decision construing juvenile procedural rights, *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the Supreme Court determined that the fifth amendment's double jeopardy clause requires transfer

hearings to determine whether a particular juvenile should be prosecuted as an adult in criminal court to be conducted prior to the start of any adjudicative hearing in juvenile court. Discussing the juvenile court system, the Court stated, "We recognize that juvenile courts, perhaps even more than most courts, suffer from the problems created by spiraling case loads unaccompanied by enlarged resources and manpower.... And courts should be reluctant to impose on the juvenile court system any additional requirements which could strain its resources as to endanger its unique function." *Id.* at 537, 95 S.Ct. at 1789.

Having reviewed the applicable Supreme Court decisions regarding the constitutional rights of adults in probation revocation hearings and those addressing the procedural rights of juveniles, the next step is to consider whether these cases mandate that juveniles are constitutionally entitled to the same right of confrontation afforded adults in probation revocation proceedings.[1]

In *State ex rel. D.E. v. Keller*, 251 So.2d 703 (Fla.Dist.Ct. App.1971), the Florida District Court of Appeals extended the procedural rights established in *Gault* to probation revocation hearings, thereby entitling juveniles in probation revocation hearings to the right to confront and cross-examine witnesses. The court reasoned that although the supreme court had considered only the adjudicatory process in *Gault*, certain passages of the opinion indicate that the

---

1. Although in *Holmes' Appeal*, 379 Pa. 599, 109 A.2d 523 (1954), our supreme court held that hearsay was admissible in a juvenile court proceeding, reasoning that "from the very nature of the hearings in the Juvenile Court it cannot be required that strict rules of evidence should be applied as they properly would be in the trial of cases in the criminal court," *id.*, 379 Pa. at 606, 109 A.2d at 526, our resolution of the question before us is not controlled by this holding. *Holmes' Appeal* was decided prior to *Morrissey* and *Gagnon* as well as the Supreme court cases involving juvenile procedural rights which were discussed above. Therefore, the impact of these cases on the supreme court's holding in *Holmes* is unknown. Moreover, as the supreme court acknowledged in its opinion, it is unclear whether the juvenile hearing involved in *Holmes' Appeal* was an adjudicatory hearing or a probation revocation hearing. *Id.*, 379 Pa. at 608–09, 109 A.2d at 527. Consequently, it is questionable whether the supreme court's holding in *Holmes' Appeal* bears upon the issue before us at all.

fundamentals of due process should be applied in other critical stages affecting the liberty of a juvenile.

In *State v. Daugherty*, 298 S.E.2d 834 (W.Va.1982), the West Virginia Supreme Court of Appeals was confronted with the issue of whether the due process clause of the United States Constitution requires that a juvenile be given a hearing before his probation is revoked. Addressing this issue, the court first noted its decision in *State v. MacQueen*, 163 W.Va. 620, 259 S.E.2d 420 (1979), in which it had stated:

> Neither the United States Supreme Court nor this Court has expressly spoken to the procedural requirements due a juvenile in parole revocation proceedings. In a series of cases, however, the Supreme Court has held that juveniles are entitled to procedural protections previously denied them under the doctrine of parens patriae. The command of these cases is that the constitutional rights of the juvenile can no longer be ignored but that he must be afforded constitutional due process and fair treatment.

259 S.E.2d at 422 (holding that juveniles in parole revocation hearings are entitled to the same protections afforded adults by *Morrissey*). Then, observing the constitutional protections established for adults in probation revocation hearings by *Morrissey* and *Gagnon*, and reasoning that the interest of the juvenile probationer is no less valuable than that of the adult probationer, the West Virginia court ruled that juveniles in probation revocation proceedings are entitled to the same protections as adults in those proceedings.

I am not persuaded by the reasoning of the Florida District Court of Appeals or the West Virginia Supreme Court. Unlike these two courts, I find nothing in the supreme court cases discussed above to lead to the conclusion that juveniles are constitutionally entitled to the right of confrontation established by *Morrissey* and *Gagnon*.

Although *Kent, Gault, Winship, McKeiver,* and *Breed* greatly affect the procedure of adjudicatory hearings in the juvenile court system, they clearly do not mandate our adoption of any corresponding constitutional rights in pro-

bation revocation hearings. The Supreme Court explicitly recognized the distinction between adjudicatory and post-adjudicatory hearings, and the necessity for analyzing the conditional requirements of each type of hearing separately. Furthermore, these decisions convey the Supreme Court's belief that the unique characteristics of the juvenile court system are worth preserving and its view that the full range of constitutional rights afforded accused adults should not be mechanically imposed upon the juvenile court system. *Accord In the Interest of Doe*, 62 Haw. 70, 610 P.2d 509 (1980) (*Kent, Gault, Winship*, and *McKeiver* "manifest a definite concern for investing relevant juvenile proceedings with due process within a humanitarian system where rehabilitation is unquestionably the primary goal ...").

At the dispositional stage of the juvenile court system, the court is concerned with determining the disposition best suited for a juvenile's treatment, supervision, rehabilitation and welfare. The court is not deciding the child's guilt or innocence. That has already been determined at the adjudicatory hearing, to which all the procedural rights enunciated in *Gault* apply. It is only after a finding of guilt has been made at the adjudicatory hearing that a disposition hearing is conducted at all.

One of the unique characteristics of the juvenile court system is its goal of rehabilitating, rather than punishing, the juveniles appearing before it. Our juvenile courts ask not what punishment should this youth be given for his unlawful behavior, but what can be done to help this youngster get back on the right track. Although this goal of rehabilitation may not always be attainable, it is a humane and arguably necessary one to which our society should aspire. As has been said many times, the preservation of our society depends upon the youth of today developing into responsible, law-abiding adults.

In order to decide how to undertake the rehabilitation of a particular juvenile, the court needs as much information regarding the youth's background, problems, personality,

relationships, and actions as possible. The more a judge knows about a juvenile, the better able he or she will be to fashion an individualized course of rehabilitation. In a probation revocation hearing, the court is called upon to re-evaluate its original disposition order to ascertain whether a change in disposition is necessary. To this end, once again, the juvenile court judge needs access to all available information regarding the juvenile if this determination is to be made with the precision that the rehabilitation purposes of our juvenile justice system require.

Because, in conducting a hearing on disposition or probation revocation, the juvenile court is not deciding the guilt or innocence of the juvenile, and because the goal of the juvenile system is to rehabilitate juveniles, rather than to punish them, these hearings have always been conducted in an informal manner. Only through an informal hearing can the juvenile judge gather the information necessary for the formulation of a practical and effective course of rehabilitation for each juvenile. I believe the informal nature of these hearings continues to be essential to the vitality of the juvenile court system. Extending the right of confrontation established in *Morrissey* and *Gagnon* to juveniles in probation revocation hearings would impair the judge's ability to learn as much as possible about the youth and would infringe upon the informal manner in which the hearings are conducted. *See* N. Cohen & J. Gobert, *The Law of Probation and Parole* 433 (1983) (employment of hearsay rules would significantly alter the nature of probation revocation hearings). Therefore, I would hold that juveniles are not constitutionally entitled to full confrontation rights in probation revocation proceedings and, consequently, that juveniles do not have this right in our Commonwealth. Accordingly, I would rule that the hearing court did not err when it admitted the hearsay testimony of Davis's probation officer and I would affirm the order revoking Davis's probation.

OLSZEWSKI, TAMILIA and POPOVICH, JJ., join.