J-A10020-26

2026 PA Super 110

IN THE INT. OF: K.W.-D., A MINOR     :   IN THE SUPERIOR COURT OF
:        PENNSYLVANIA
:
APPEAL OF: K.W.-D., MINOR       :
:
:
:
:
:
:   No. 2075 EDA 2025

Appeal from the Dispositional Order Entered June 16, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-JV-0000107-2024

BEFORE:    STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

OPINION BY LANE, J.:                      **FILED MAY 29, 2026**

      K.W.-D., a juvenile, appeals from the dispositional order which revoked his probation, committed him to the Commonwealth's custody, and placed him in a secure residential facility. Because the Commonwealth did not file a written motion to revoke K.W.-D.'s probation, providing him with notice of the grounds on which it would be seeking revocation as well as the evidence upon which it would be relying in its pursuit of revocation, K.W.-D.'s due process rights were violated. Accordingly, we vacate the order and remand for further proceedings.

      The relevant factual and procedural history of this matter is as follows. In early 2024, K.W.-D. was involved in an incident wherein he, along with others, repeatedly punched and kicked the victim at a store. The Commonwealth filed a delinquency petition against K.W.-D. wherein it

_____

[*] Former Justice specially assigned to the Superior Court.

charged him as a juvenile with simple assault, harassment, and related offenses. After several delays, the matter proceeded to an adjudicatory hearing in April 2024, at which the trial court imposed a 7:00 p.m. curfew and mandatory school attendance. The juvenile court conducted a further adjudicatory hearing in May 2024, at which the court extended the curfew to 9:00 p.m., and maintained mandatory school attendance. In June 2024, the juvenile court conducted a further adjudicatory hearing at which it found that K.W.-D. had committed one or more of the delinquent acts alleged in the petition, but deferred its determination as to whether he was delinquent. The juvenile court placed K.W.-D. on interim probation, granted him permission to work, ordered him to attend anger management, obey the law and remain arrest free, stay away from the store where the incident occurred, and to refrain from having any contact with the victim.

In July 2024, a hearing officer conducted a deferred adjudicatory hearing at which it ordered K.W.-D. to comply with in-home detention ("IHD"), attendance at the Philadelphia Youth Advocate Program ("PYAP"), and continued interim probation with all conditions to remain, but deferred adjudication to another hearing. K.W.-D. failed to appear at the next hearing and a bench warrant was issued for his arrest. K.W.-D. appeared at court later in the day and the bench warrant was lifted. He was held at the Philadelphia Juvenile Justice Services Center ("PJJSC"), and another hearing was scheduled.

In August 2024, the juvenile court conducted a deferred adjudicatory hearing at which it placed K.W.-D. in his grandmother's care on PYAP and IHD and ordered him placed on GPS subject to house restrictions, to remain on interim probation, attend and complete anger management, obey the law, remain arrest free, enroll in and attend school with no unexcused absences, lateness, or suspensions, and attend and complete a drug and alcohol assessment. At an October 2024, deferred adjudicatory hearing, the juvenile court ordered K.W.-D. to remain on interim probation with all previous conditions to remain in effect, apart from being house restricted, and imposed a 7:00 p.m. curfew.

On December 3, 2024, the juvenile court adjudicated K.W.-D. delinquent on the charges of simple assault and harassment and placed him on probation, still subject to GPS with house restrictions. K.W.-D. remained subject to IHD and PYAP, but the juvenile court ordered his probation officer ("PO") to refer K.W.-D. to the Post-Evening Reporting Center ("Post-ERC"). The juvenile court ordered K.W.-D. to remain arrest free, obey the law, attend drug and alcohol counseling with the appropriate referral from probation, and continue attending school with no unexcused absences, lateness, or suspensions. These conditions remained in place at the review hearings conducted on February 10 and March 17, 2025.

The juvenile court conducted a review hearing in March 2025, at which PO Daniel Murtagh ("PO Murtagh"), relying on reports from outside sources,

informed the juvenile court that some of K.W.-D. grades were improving, he had finished his apology letter, completed anger management, was compliant with PYAP, and received a spot in the Post-ERC program. *See* N.T., 3/24/25, at 5-6. The PO reported that K.W.-D. was not attending drug and alcohol treatment and had several GPS violations. *See id*. at 6-7. Based on these compliance issues and some positive drug screens, the juvenile court ordered that K.W.-D. be committed to Post-ERC and attend drug and alcohol treatment. *See id*. at 15-16, 17-19.

At the next review hearing on May 1, 2025, PO Murtagh again provided an oral update of information he had received. Though none of the parties had a school report, the PO testified that K.W.-D. had an additional eight absences, eighteen tardies, and several of his grades had dropped to Fs since the last court date. *See* N.T., 5/1/25, at 4, 12. The PO additionally reported that K.W.-D. had partially attended his drug and alcohol treatment program but consistently submitted screens that were positive for marijuana. *See id*. at 5. Although he was enrolled in Post-ERC, K.W.-D. had been absent from the program ten times and had five tardies. *See id*. The PO and Commonwealth alleged six GPS violations since the last court date; however, the GPS PO was not present and did not testify. *See id*. at 5-6. The juvenile court asked K.W.-D. about his absences, grades, and GPS violations. *See id*. at 13, 16-17, 19-21. K.W.-D. stated that he was speaking with his school counselor and planned to take summer school classes, and the GPS concerns

were related to some scheduling issues with his programs. ***See id***. at 16-17, 20-22. The juvenile court ordered K.W.-D. to remain on probation, improve his grades and attendance at Post-ERC and his drug and alcohol program, and to stop violating his GPS. ***See id***. at 22. The juvenile court indicated that if K.W.-D.'s behavior improved, the court had "no issues, possibly, to even discharge his probation." ***Id***. at 23-24.

The juvenile court thereafter issued a dispositional review order which reflected its rulings and scheduled the next review hearing for June 12, 2025. ***See*** Dispositional Review Order, 5/1/25, at 2. The order specifically listed the "Next Scheduled Court Date" as a "Review Hearing." ***Id***. The review hearing was subsequently rescheduled to June 16, 2025. The juvenile court then issued a "Notice of Review Hearing" to the parties which expressly indicated that the June 16 hearing would be a "Review Hearing." ***See*** Notice of Review Hearing, 5/1/25, at 1.

On June 16, 2025, the juvenile court commenced the review hearing by requesting a general update. PO Nikole Reed ("PO Reed") provided a responsive summary, recounting the contents of other professionals' reports of K.W.-D's behavioral progress. ***See*** N.T., 6/16/25, at 6-10. PO Reed referenced a report from K.W.-D.'s Post-ERC program, which recommended an additional thirty days of participation to assess his commitment to the program because he sometimes did not show interest or participate during workshops and groups, and was not always prepared with assignments. ***See***

*id*. at 6-7. PO Reed stated that the report indicated K.W.-D. was late four times, but she did not note any absences. *See id*. at 7. PO Reed did not indicate whether the report was oral or written; however, no report was produced at the hearing or entered into evidence. PO Reed also summarized a report from K.W.-D's drug and alcohol program at Northeast Treatment Center Intensive Outpatient Program ("NET IOP"), which indicated that K.W.-D. was attending consistently, and NET was working to get him clean, though he continued to have positive screens. *See id*. at 8. PO Reed noted that the report reflected one negative screen "[b]ut the dates seem a little inconsistent for that." *Id*. This report was not produced or entered into evidence. PO Reed stated K.W.-D.'s school attendance had improved, and his final grades reflected slight improvements in two subjects (History and English went from Fs to Ds), but that he still had failing grades in other subjects. *See id*. at 8-9. PO Reed did not cite a source for this information, and no report was produced or entered into evidence.

Finally, PO Reed reported that "per G[P]S, we have a couple violations." *Id*. at 9. For one of the violations, K.W.-D. arrived early at his Post-ERC program before the doors had opened, but remained where he was until he entered at the time the program started. *See id*. at 9. The second violation was a twenty-six-minute stop at a playground on his way home after attending his drug and alcohol program. *See id*. at 9. As for the third violation, the PO testified that she "couldn't tell if [she] could actually count this as a violation,"

as she "forgot to ask upstairs," but K.W.-D. left school, was on his way home, realized he would not make it all the way home and back to Post-ERC, and turned around and went to Post-ERC. *Id*. at 9-10. Another GPS violation reportedly occurred when K.W.-D. was late to school, and another when he was late to his program. *See id*. at 10. His final violation occurred when he walked a friend to the bus stop. *See id*. at 10. No GPS report was produced or entered into evidence, nor did anyone from the GPS unit appear at the hearing to testify regarding these violations.

PO Reed recommended that K.W.-D. "remain probation, remain Post-ERC, remain GPS house restrictions, continue drug and alcohol at NET, mandatory school, random drug screens, [thirty-]day [c]ourt date." *Id*. at 10. Counsel for K.W.-D. agreed with the PO's recommendations. *See id*. at 10-11. The Commonwealth, however, orally requested the revocation of K.W.-D.'s probation and asked for his placement in a secure facility "based purely on the fact that he's violating this court's orders with the multiple violations." *Id*. at 12-14 (unnecessary capitalization omitted). The juvenile court asked K.W.-D. if he wanted to speak, and he explained that the house restrictions had been difficult for him because he wasn't used to staying in the house all the time, and it was hard for him to keep on top of his schoolwork because of the two programs he had to attend. *See id*. at 14-15. Citing the timeline of the case, the juvenile court indicated it did not have "any more programs to put [K.W.-D.] on." *Id*. at 18-19. The juvenile court then revoked

K.W.-D.'s probation and ordered him to be held in secure detention at PJJSC pending transport to Youth Forestry Camp. *See id*. at 20-21, 23, 25.

K.W.-D. filed a timely motion for reconsideration wherein he argued that: (1) he lacked notice that the hearing was a revocation hearing; (2) the lack of notice prevented him from presenting his case; (3) revocation of probation cannot be based solely on hearsay evidence; and (4) placement was not the least restrictive alternative, as he could safely remain in the community. *See* Motion to Reconsider, 6/25/25, at 2-10.

The juvenile court conducted a status-of-transfer hearing in July 2025, at which defense counsel again argued that he did not have notice that the June 16, 2025 hearing would be a revocation hearing and was therefore unprepared to present a case in opposition. The juvenile court responded:

> [E]very time someone is on probation, at any date, it could be a revocation hearing. You were well[-]aware of [K.W.-D.'s] compliance because you actually have access to the PO notes. So, you know what's happening. You know [K.W.-D.'s] lack of compliance, and he's been represented by counsel every single time. So, [K.W.-D.] had plenty of notice because he's been to court. He was told that. So, he knows what's going on.

N.T., 7/11/25, at 7-8. The court then entered an order denying the motion for reconsideration. K.W.-D. filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

K.W.-D. raises the following issues for our review:

A. Did the [juvenile] court err and abuse its discretion by revoking K.W.-D.'s probation on June 16, 2025 because:

i. K.W.-D. was not provided notice that the June 16, 2025 review hearing was a revocation hearing and was not provided written allegations of the specific conditions allegedly violated or a supporting factual summary as required by the due process clauses of the United States and Pennsylvania Constitutions and Pa.R.J.C.P. 612;

ii. No party requesting revocation filed and served upon K.W.-D. a written motion for revocation or modification of disposition as required by Pa.R.J.C.P. 612 and Pa.R.J.C.P. 345;

iii. All the evidence relevant to possible probation violations presented at the June 16, 2025 hearing was hearsay, which cannot be the sole basis for a revocation of probation under the federal and broader state protections afforded by their respective due process clauses.

B. Did the [juvenile] court err and abuse its discretion by preventing K.W.-D.'s counsel from putting on testimony that would have included presenting an alternative community plan, in violation of K.W.-D.'s due process rights?

K.W.-D.'s Brief at 2-3 (unnecessary capitalization omitted).

In his first issue, K.W.-D. asserts that his due process rights were violated. "A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." ***Commonwealth v. Tejada***, 161 A.3d 313, 317 (Pa. Super. 2017).

At the outset, we offer a brief overview of the controlling authority in this area. The Pennsylvania Legislature has set forth the law relating to the care, guidance, control, placement, trial, and commitment of delinquent, dependent, and neglected children in Pennsylvania's Juvenile Act ("Juvenile

Act").  *See* 42 Pa.C.S.A. §§ 6301-6375.  The Juvenile Act seeks to address

the problems unique to court proceedings that involve minors:

> One of the stated goals of the Juvenile Act is to provide for the care, protection, and wholesome mental development of children.  The purpose of juvenile proceedings is to seek treatment, reformation and rehabilitation, and not to punish.  It cannot be ignored that one of the purposes of the Juvenile Act is to hold children accountable for their behavior.  To this end, the juvenile court system was designed to provide a distinctive procedure and setting to deal with the problems of youth.

*In re J.B.*, 39 A.3d 421, 426-27 (Pa. Super. 2012) (footnote and citations

omitted).

The purposes and policies underlying the juvenile justice system differ

significantly from those of the criminal justice system, and the juvenile justice

system operates in a manner wholly different from the criminal justice system.

*See In re M.D.*, 839 A.2d 1116, 1119 (Pa. Super. 2003).  Pursuant to the

Juvenile Act, juveniles are not charged with crimes; rather, they are charged

with committing "delinquent acts."  42 Pa.C.S.A. § 6302.  Under the Juvenile

Act, juveniles do not have a trial; rather, they have an adjudicatory hearing.

*See* 42 Pa.C.S.A. §§ 6303, 6341.  If the juvenile court finds, upon proof

beyond a reasonable doubt, that the child committed the delinquent acts, the

juvenile is not convicted; rather, the child is adjudicated delinquent.  *See* 42

Pa.C.S.A. § 6341.  The Juvenile Act specifically states that an adjudication

under its provisions is not a conviction of crime.  *See* 42 Pa.C.S.A. § 6354.

Thus, even though juvenile courts concern themselves with acts which would

be considered criminal if they were committed by adults, our legislature has

authorized, through the Juvenile Act, separate non-criminal proceedings to adjudicate these matters because the perpetrators are not adults. **See In the Interest of R.A.**, 761 A.2d 1220, 1225 (Pa. Super. 2000).

The order of disposition in a juvenile matter is akin to the judgment of sentence in a criminal matter. **See In re M.D.**, 839 A.2d at 1119. The Juvenile Act sets out the broad range of possibilities afforded the judge at disposition, which include probation under conditions and limitations the court prescribes, commitment to an institution, youth center or camp, and the imposition of fines, costs and restitution. **See** 42 Pa.C.S.A. § 6352. In the case of the juvenile offender, his disposition is subject to frequent, mandatory review by the hearing court. **See In re M.D.**, 839 A.2d at 1119.

Section 6352 does not, however, address revocation or modification of existing dispositional orders. Nonetheless, "the discretion of the juvenile court in implementing a disposition is broad, it is flexible and the juvenile court has considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile." **In re Love**, 646 A.2d 1233, 1238 n.5 (Pa. Super. 1994) (unnecessary capitalization omitted).

In **Morrissey v. Brewer**, 408 U.S. 471 (1972), the United States Supreme Court established constitutional due process requirements for parole revocation with respect to adult offenders. Specifically, the High Court held that, in the context of parole, parolees have an interest in their continued liberty which, although indeterminate, does not permit the state to revoke

parole without some informal procedural guarantees. *See id*. at 481, 483. The *Morrissey* Court explained that revocation involves a two-step decision: (1) whether the parolee has in fact acted in violation of one or more conditions of his parole; and (2) if so, should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation. *See id*. at 479-80. The *Morrissey* Court further ruled that, pursuant to the Fourteenth Amendment to the United States Constitution, "the minimum requirements of due process" applicable to these two stages include written notice of the claimed violations of parole, disclosure to the parolee of evidence against him, and the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation). *See id*. at 488-89.

In *Gagnon v. Scarpelli*, 411 U.S. 778 (1973), the High Court extended these constitutional protections to adult offenders facing probation revocation, and ruled that a probationer, just as a parolee, is likewise entitled to the two-stage revocation process, with due process protections which include, *inter alia*, written notice of the claimed violations of probation, disclosure of the evidence to be presented, and the right to confront the witnesses against the probationer. *Id*. at 786-87.

In *In re Gault*, 387 U.S. 1 (1967), the United States Supreme Court held that the Fourteenth Amendment guarantees a child, who is alleged to have committed delinquent acts, a timely written notice of the initial

adjudicatory hearing — setting forth with particularity the specific charges and factual allegations, an opportunity to prepare, a right to counsel, an opportunity to be heard, a right to confront witnesses, and a privilege against self-incrimination. *See id*. at 10-13, 41, 55-58. However, the High Court did not address the constitutional requirements in relation to other issues, including "the procedures or constitutional rights applicable to . . . the post-adjudicative or dispositional process." *Id*. at 13. Thus, to date, the High Court has not specifically addressed whether *Morrissey* and *Gagnon* extend to the notice requirements attendant to revocation of probation proceedings in juvenile matters.

Similarly, the Pennsylvania Supreme Court has not addressed this particular issue. However, our High Court has had the occasion to review a ruling by this Court pertaining to hearsay testimony offered as the basis to support the revocation of a juvenile's probation. In *In Interest of Davis*, 546 A.2d 1149, 1153 (Pa. Super. 1988) (*en banc*), *aff'd sub nom Commonwealth v. Davis*, 586 A.2d 914 (Pa. 1991) (plurality), this Court held that *Gagnon* due process rights — pertaining to the right to confront witnesses — apply in the juvenile setting, as it constitutes an adjudicatory proceeding. In *Davis*, the juvenile court revoked a juvenile's probationary status based solely on an officer's testimony in which the officer related hearsay statements from the juvenile's father. *Id*. at 1150. This Court ruled that, "[i]n view of the substantial liberty interests which exist in not having

probation revoked on the basis of unverified facts or erroneous information, . . . due process considerations entailing the right to confront and cross-examine an accuser must extend to probation revocation proceedings for a juvenile." *Id*. The *Davis* Court did not consider whether constitutional due process requires that a juvenile facing revocation of probation be provided with the same level and extent of notice as *Gagnon* requires be provided to an adult probationer.

Nevertheless, our Supreme Court, via its rule-making authority, has provided due process protections in the context of the revocation of a juvenile's probation through its implementation of Rule 612(A) of the Rules of Juvenile Court Procedure, which mandates that "[a] motion to modify or revoke probation *shall be filed* in accordance with Rule 345." Pa.R.J.C.P. 612(A) (emphasis added). Importantly, the comment to Rule 612 contemplates that the due process protections recognized by the United States Supreme Court in *Gagnon* and *Scarpelli*, in the adult revocation context, should be afforded to juvenile offenders on probation. The comment expressly provides: "A juvenile should be afforded due process before probation can be revoked. *Cf. Gagnon v. Scarpelli*, 411 U.S. 778 (1973); *Morrissey v. Brewer,* 408 U.S. 471 (1972)." Pa.R.J.C.P. 612, *Comment*. The comment further provides that "[a] juvenile's probation cannot be revoked simply on the grounds of hearsay evidence. *In re Davis,* 586 A.2d 914 (Pa. 1991)." *Id*. Thus, the official comment to Rule 612 specifically contemplates that a

juvenile offender facing probation revocation should be afforded the same constitutional due process protections recognized in *Gagnon* and *Scarpelli* before probation can be revoked.

Recently, this Court directly addressed the question of whether the constitutional due process protections provided to adult probationers when faced with the prospect of revocation, as recognized by the High Court in *Gagnon* and as contemplated in the comment to Rule 612(A), should be extended to juvenile offenders facing probation revocation. *See In the Int. of K.G.-B.*, 2026 Pa. Super. LEXIS 98 (Pa. Super. 2026).[1] The *K.G.-B.* Court determined that *Gagnon*'s constitutional notice requirements apply when a juvenile offender is faced with probation revocation. In arriving at this conclusion, the *K.G.-B.* Court balanced the three considerations relevant to a due process analysis[2] and determined that: (1) "the juvenile's interest in the governmental action is perhaps even stronger than in the adult criminal context;" (2) "written notice of the alleged violations and disclosure of the

---

[1] This Court's decision in *K.G.-B.* was filed after the parties had submitted their appellate briefs. Therefore, they did not address the impact of the *K.G.-B.* Court's decision in their written submissions to this Court.

[2] The *K.G.-B.* Court determined that "[a]scertaining what process is due entails a balancing of three considerations: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state." *K.G.-B.*, 2026 Pa. Super. LEXIS 98 at *20 (*quoting Bundy v. Wetzel*, 184 A.3d 551, 557 (Pa. 2018)).

evidence to be presented helps ensure that the juvenile court has the best information available before depriving the juvenile of his or her liberty;" and (3) there are no additional administrative burdens of providing such due process. *See id*. at **21-22. Based on its balancing of these factors, the *K.G.-B.* Court concluded:

> [P]ursuant the rationale of *Davis*, viewed along with the text of, and comments to, the Rules of Juvenile Court Procedure, due process requires that a juvenile receive written notice that the Commonwealth is seeking to revoke probation containing the violations alleged, and that the Commonwealth disclose the evidence in support thereof, before a juvenile court may revoke probation. It would be anomalous to hold that under *Davis*, a juvenile has a due process right of confrontation in juvenile revocation proceedings but not the more basic notice of the allegations against him or her and the disclosure of evidence to be presented in support thereof, particularly given our Supreme Court's clear statement that a juvenile should receive due process before the revocation of probation. *See* Pa.R.J.C.P. 612, cmt.; *see also Pennsylvania Coal Min. Ass'n v. Ins. Dep't*, 370 A.2d 685, 692 (Pa. 1977) ("Notice is the most basic requirement of due process.").

*Id*. at **22-23.

In *K.G.-B.*, the parties appeared before the juvenile court for what they knew to be a revocation hearing in connection with the juvenile offender's probation. Nevertheless, the *K.G.-B.* Court determined that the notice and information provided to K.G.-B. in advance of the revocation hearing was constitutionally inadequate because the Commonwealth did not disclose the evidence upon which it relied in support of the allegations to K.G.-B. in advance of the hearing. The *K.G.-B.* Court ruled that the Commonwealth's failure to file and serve a written motion for revocation of probation identifying

- 16 -

the bases for revocation and to disclose the evidence upon which it would rely to support those allegations, as required by **Gagnon** and the Rules of Juvenile Court Procedure, required that the order revoking probation be vacated. **See id**. at **25-27.

With this background in mind, we turn to K.W.-D.'s arguments regarding his first issue. Relying on **Morrissey**, K.W.-D. asserts that due process requires notice that a hearing to revoke probation will be held, as well as the allegations supporting the revocation request. K.W.-D. further asserts that Rule 612(A) explicitly protects a juvenile's right to notice of an impending revocation by requiring the filing of a written motion. K.W.-D. submits that Rule 612(A) merely echoes and gives effect to the constitutional right to procedural due process, which prohibits the government from depriving individuals of life, liberty, or property, unless it provides the process that is due. K.W.-D. argues that his liberty interest was interfered with, as his probation was revoked, resulting in removal from his home and placement in a secure facility. K.W.-D. claims that, on this basis, he was entitled to constitutionally sufficient procedures, which he did not receive. K.W.-D. points out that no revocation motion was filed, either by the PO or the Commonwealth, and he was afforded neither notice of motion for revocation nor a meaningful opportunity to contest such a motion.

K.W.-D. further challenges the trial court's determination that he had adequate notice of a revocation hearing simply because he was notified that

a probation review hearing would take place. K.W.-D. points to the trial court's reasoning that "every time someone is on probation, at any date, it could be a revocation hearing," and claims that this justification is deeply flawed. K.W.-D.'s Brief at 21 (*quoting* N.T., 7/11/25, at 7-8). K.W.-D. maintains that "[d]ue process requires more than the knowledge that **any** hearing will be held; as our courts have acknowledged, a revocation of probation hearing is something indisputably different with distinct procedural protections, and therefore notice of the type of hearing is a fundamental element of due process." **Id**. at 21 (footnote omitted, emphasis in original).

K.W.-D. contends that because he had no notice that the June 16, 2025 hearing would be a revocation proceeding, and neither he nor his counsel were aware that the proceeding was a revocation hearing until the Commonwealth orally requested revocation at the conclusion of the hearing, he did not have an adequate opportunity to meaningfully respond to the allegations presented in PO Reed's report. K.W.-D. submits that even if certain of the information on which PO Reed relied had been provided to defense counsel or was accessible to defense counsel through a digital case management system, the "[d]igital availability of some documents or reports, which may allege misbehavior or violations, does not create standing notice that any review hearing may be converted into a revocation hearing based on any and all information that the defense may possess, or to which it is given access." **Id**. at 23.

The juvenile court considered K.W.-D.'s first issue and determined that it lacked merit. The court reasoned:

[K.W.-D.] was afforded due process at every step of these proceedings. In the instant case. [K.W.-D.] was present in the courtroom and represented by counsel, and there was no issue on record regarding the impartiality of the court. [K.W.-D.] and his attorney were informed of every proceeding either at the bar of the court or through electronic service, almost always through both. [K.W.-D.] had the opportunity to be heard at each proceeding, whether it was [K.W.-D.'s] personal testimony or representation of the same through counsel. While it was the first time [defense counsel] was representing [K.W.-D.] in this matter, she nevertheless had the opportunity to present her argument and any evidence in its support, including but not limited to alternative plans for placement that accomplished the treatment, supervision, and rehabilitation goals of probation. For [K.W.-D.] to claim that his counsel was prevented from putting on testimony that would have included such a plan is disingenuous. [K.W.-D.'s] attorney was underprepared for the outcome of the hearing, and as such, did not have said alternative plan to present to the court.

Additionally, notice was given at the bar of the court of the review hearing on June 16, 2025 after the review hearing on May 1, 2025 concluded. Despite the numerous probation violations that had been reported, [K.W.-D.] was permitted to remain on probation at that time, with the trial court specifically emphasizing that [K.W.-D.] needed to improve attendance and lateness in all programs. [K.W.-D.] was well informed of what was expected of him come the next review hearing, and defense counsel is more than familiar with the probation review process, including the consequences of negative probation reports. Furthermore, as indicated by the secure docket summary for this petition, electronic service was effectuated on all parties successfully on May 1, 2025; regardless of the type of hearing that was to occur in this case, notice was provided per court protocol.

Insofar as the purported due process violations connect to the alleged hearsay evidence, PO Reed was the authority on the contents of the reports and was the point of contact for all of [K.W.-D.'s] supervisory parties. Under section 6304(a) of the Juvenile Act, a probation officer shall: 1) make investigations, reports, and recommendations to the court; 2) receive and

- 19 -

examine complaints and charges of delinquency or dependency of a child for the purpose of considering the commencement of proceedings under this chapter. It is within the authority of the probation officers to compile reports as they pertain to ongoing supervision and rehabilitation. It stands to reason that if the reports of the probation officers cannot be relied on, if the other organizations responsible with the ongoing supervision, rehabilitation, and treatment of these juveniles cannot be trusted, reviews of probation would be much more difficult, if not impossible, to conduct. Being unable to rely on those charged with the care of these children frustrates the purpose of their supervision if they cannot provide their reports to the court through the probation officers. Probation officers are the authorities on which the court relies to provide accurate and up to date information on the juveniles under its supervision, and as such, they are often present during a myriad of proceedings to provide testimony and to answer questions not just from the court, but from the Commonwealth and the defense. The present case is no different, and [defense counsel] had the opportunity to question PO Reed about the reports relied on for recommendation and she had the opportunity to review those reports. To that point, PO Reed brought all the reports she obtained during her investigation to court on June 16, 2025, and clearly [defense counsel] was in possession of some, if not all, of the same reports, as she offered up her copy of NET lOP's report when PO Reed could not find hers.

There is a long-standing agreement between Philadelphia Family Court's probation administration, the District Attorney's office, and the Public Defender's office to have access to the Juvenile Case Management System, wherein all progress reports, investigations, and any other information relevant to the supervision of the juvenile probationers is uploaded. [K.W.-D.'s] probation records, including reports on his noncompliance and specified violations of his probation terms, are also accessible in the Juvenile Case Management System, and defense counsel would know this.

Juvenile Court Opinion, 9/24/25, at 13-14 (citations and unnecessary capitalization omitted).

Based on our review, and in light of this Court's ruling in **K.G.-B.**, we conclude that K.W.-D. was deprived of his constitutionally protected due process rights when he was not provided with written notice of the Commonwealth's intent to seek revocation of his probation, nor written notice of the specific allegations and evidence supporting the request for revocation, in advance of a scheduled revocation hearing. Here, the juvenile court scheduled the matter for a monthly probation **review** hearing. **See** Dispositional Review Order, 5/1/25, at 2. The order specifically listed the "Next Scheduled Court Date" as a "Review Hearing." **Id**. The review hearing was subsequently rescheduled to June 16, 2025, and the juvenile court then issued a "Notice of Review Hearing" to the parties which specifically indicated that the June 16 hearing would be a "Review Hearing." **See** Notice of Review Hearing, 5/1/25, at 1. At no time was K.W.-D. provided with written notice that the Commonwealth intended to seek revocation of his probation, in violation of Rule 612(A). Nor did the Commonwealth provide K.W.-D. with written notice of the specific allegations and evidence upon which it intended to rely in seeking the revocation of his probation. **See K.G.-B.**, 2026 Pa. Super. LEXIS 98 at *22-23. The fact that the juvenile court issued a written notice of a **review** hearing does not satisfy or excuse the requirement for a written notice of a **revocation** hearing. The notice of a review hearing that was issued to K.W.-D. was constitutionally inadequate to properly advise K.W.-D. of the Commonwealth's intent to deprive him of his liberty interest by

seeking the *revocation* of his probation. Similarly, the fact that defense counsel may have had access to some, or even all of K.W.-D.'s progress reports, does not vitiate his right to due process with respect to the notice of the Commonwealth's intent to revoke his probation. The mere fact that defense counsel may have been aware that K.W.-D.'s progress was lacking or that he was non-compliant with some of the conditions of his probation is of no consequence. Counsel cannot be expected to guess or surmise the potential basis or bases on which the Commonwealth might opt to seek revocation of a juvenile offender's probation. Instead, the Commonwealth was required to provide K.W.-D. and his counsel with notice of the specific allegations and evidence supporting the request to revoke his probation. Under these circumstances, we conclude that the Commonwealth's failure to file and serve a written motion for revocation of probation, identifying the specific bases for revocation and the evidence upon which it would rely to support those allegations, as required by *Gagnon* and the Rules of Juvenile Court Procedure, requires that we vacate the order revoking K.W.-D.'s probation. *See K.G.-B.*, 2026 Pa. Super. LEXIS 98 at *22-23.

K.W.-D. additionally contends that the juvenile court's order revoking his probation must be reversed because: (1) the juvenile court based its ruling on hearsay statements; and (2) K.W.-D.'s counsel was prevented from putting on testimony, including presenting an alternative community plan. Because we conclude that the dispositional order must be vacated for constitutionally

inadequate notice of the allegations and evidence supporting the revocation request, we need not address these additional claims.

Order vacated.  Case remanded.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/29/2026